UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

AMON ALEXANDER-HASSAN WILLIS,

      Plaintiff,

v.

ERICA HUSS; MARK CAVIN; MEGAN
NEUBECKER; DREW OGLE; UNKNOWN
BRENNAN; UNKNOWN COBB; JEFFREY
CONTRERAS; KEITH PELKY; CHARLIE
SCOTT; PEGGY ERICKSON; DARRIN
VIITALA; AMY WESTCOMB; JAMIE KOSKI;
BRENDA JAMES; RUTH JONES; AND
ERIC CHANG; in their individual capacities,
and WELLPATH, LLC.; and
MICHIGAN DEPARTMENT OF
CORRECTIONS,
        Defendants.

No.2:22-cv-211
Hon. Maarten Vermaat

---

THE NUNLEY LAW GROUP, PLLC
ROYCE A. NUNLEY (P79906)
JOSHUA HADLEY (P80080)
Attorneys for Plaintiff
21929 Harper Ave.
St. Clair Shores, MI 48080
(586) 778-4555
fax. 866-512-5488

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in this Complaint.*

## FIRST AMENDED COMPLAINT AND JURY DEMAND PURSUANT TO FRCP 15(a)(1)

Plaintiff, AMON ALEXANDER-HASSAN WILLIS, by and through his attorneys, THE NUNLEY LAW GROUP, PLLC., states for his First Amended Complaint and Jury Demand against Defendants as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff, AMON ALEXANDER-HASSAN WILLIS, seeks relief and all damages that flow from Defendants' multiple violations of his rights, privileges and immunities as secured by the Eighth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. §1983, and, for violations under the Americans with Disabilities Act 42 U.S.C. § 12101 *et seq* (ADA) and Section 504 of the Rehabilitation Act of 1973 29 U.S.C. §794(a) (Rehabilitation Act).

2. Plaintiff was incarcerated at Alger Correctional Facility in Munising, Michigan, and, Marquette Branch Prison in Marquette, Michigan, at all times relevant to this Complaint.

3.   The Defendants in this case knew that Plaintiff had a 5mm subdural hematoma caused, upon information and belief, by a blow to the head during an attack from another inmate on November 25, 2021, and that he was having dizzy spells and losing his balance, yet Defendants allowed the hematoma to go untreated despite Plaintiff's kites, complaints and fainting episodes which allowed the hematoma to increase in size, resulting in an emergency brain surgery on January 16, 2022.

4.   Even after Plaintiff had emergency brain surgery on January 16, 2022, Defendants continued to ignore Plaintiff's serious medical condition and continued to deprive Plaintiff of necessary medical care by refusing to comply with Plaintiff's bottom bunk restriction ordered by the treating physician in Alger Correctional Facility, acting with deliberate indifference to the serious risk of injury presented by assignment to a top bunk.

5.   Due to Defendants' deliberate indifference to Plaintiff's bottom bunk assignment, Plaintiff fainted and fell off of the top bunk to which he was assigned and hit his head on the floor on or about January 23, 2022, after which he had to be rushed to the hospital to undergo a

second emergency brain surgery, causing Plaintiff to become disabled, losing the ability to stand or walk without the assistance of a wheelchair or walker.

6. Following his second brain surgery, the Michigan Department of Corrections violated Plaintiff's rights under the ADA and Rehabilitation Act by failing to provide Plaintiff with a reasonable accommodation following the loss of his ability to walk, keeping him in an observation cell in Marquette Branch Prison for approximately five months, while depriving him of access to programming, services, and other privileges based solely on Plaintiff's disability.

7. Defendants continuously and repeatedly violated Plaintiff's constitutional rights while he was housed in Marquette Branch Prison by 1) keeping him in isolation 24 hours a day against the Michigan Department of Correction's own policies and directives, 2) depriving him of necessary health care services, 2) subjecting him to both verbal and physical abuse, and 3) denying him access to showers and sanitary living conditions.

## **JURISDICTION AND VENUE**

8. Plaintiff incorporates by reference paragraphs 1 through 7.

9. Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, and jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331.

10. Pursuant to 28 U.S.C. § 1391 (b)(2), venue is proper in the United States District Court for the Western District of Michigan because it is the judicial district in which the events giving rise to the claim occurred.

## **PARTIES**

11. Plaintiff incorporates by reference paragraphs 1 through 10.

12. Plaintiff AMON ALEXANDER-HASSAN WILLIS, at all relevant times to this Complaint, was confined within the Michigan Department of Corrections (MDOC) at Alger Correctional Facility (LMF) in Munising, Michigan, and, Marquette Branch Prison (MBP) in Marquette, Michigan under a criminal sentence issued by a court of the State of Michigan.

13. Defendant ERICA HUSS (HUSS) is and/or was the Warden at the MBP, which is located Marquette, Michigan in the Northern Division of the Western District of Michigan, and an employee and agent of the MDOC, acting under color of law, within the scope of her employment and authority, and pursuant to the MDOC's

customs, policies, and practices. She is sued in his individual capacity.

14. Defendant MARK CAVIN (CAVIN) is and/or was at all times relevant hereto a Corrections Officer at MBP who was an employee and agent of the MDOC, acting under color of law, within the scope of his employment and authority, and pursuant to the MDOC's customs, policies, and practices. He is sued in his individual capacity.

15. Defendant MEGAN NEUBECKER (NEUBECKER) is and/or was at all times relevant hereto a Corrections Officer at MBP who was an employee and agent of the MDOC, acting under color of law, within the scope of her employment and authority, and pursuant to the MDOC's customs, policies, and practices. She is sued in her individual capacity.

16. Defendant DREW OGLE (OGLE) is and/or was at all times relevant hereto a Corrections Officer at MBP who was an employee and agent of the MDOC, acting under color of law, within the scope of his employment and authority, and pursuant to the MDOC's

customs, policies, and practices. He is sued in his individual capacity.

17. Defendants, UNKNOWN BRENNAN (BRENNAN), and, UNKNOWN COBB (COBB) are and/or were at all times relevant hereto a Corrections Officers at LMF which is located in the Northern Division of the Western District of Michigan who were employees and agents of the MDOC, acting under color of law, within the scope of their employment and authority, and pursuant to the MDOC's customs, policies, and practices. They are sued in their individual capacities.

18. Defendant JEFFREY CONTRERAS (CONTRERAS) is and/or was at all times relevant Assistant Deputy Warden of Housing at LMF and an employee and agent of the MDOC, acting under color of law, within the scope of his employment and authority, and pursuant to the MDOC's customs, policies, and practices. He is sued in his individual capacity.

19. Defendant KEITH PELKY (PELKY) is and/or was at all times relevant Assistant Deputy Warden of Housing at MBP and an employee and agent of the MDOC, acting under color of law, within

the scope of his employment and authority, and pursuant to the MDOC's customs, policies, and practices. He is sued in his individual capacity.

20. Defendant CHARLIE SCOTT (SCOTT) is and/or was at all times relevant the Health Unit Manager (HUM) for MBP and an employee and agent of the MDOC, acting under color of law, within the scope of his employment and authority, and pursuant to the MDOC's customs, policies, and practices. He is sued in his individual capacity.

21. Defendant PEGGY ERICKSON (ERICKSON) is and/or was at all times relevant a Resident Unit Manager (RUM) at MBP and an employee and agent of the MDOC, acting under color of law, within the scope of her employment and authority, and pursuant to the MDOC's customs, policies, and practices. She is sued in her individual capacity.

22. Defendant DARRIN VIITALA (VIITALA) is and/or was at all times relevant a Resident Unit Manager (RUM) at MBP and an employee and agent of the MDOC, acting under color of law, within the scope of his employment and authority, and pursuant to the MDOC's

customs, policies, and practices. He is sued in his individual capacity.

23. At all relevant times herein, Defendant WELLPATH, LLC. ("WELLPATH"), is a health care corporation organized under the laws of the State of Tennessee, licensed to do business in the State of Michigan, and doing business in Alger and Marquette Counties. Defendant WELLPATH provides healthcare in LMF pursuant to a contract. Defendant WELLPATH further provides healthcare in MBP pursuant to a contract.

24. Defendant AMY WESTCOMB (WESTCOMB) is and/or was at all times relevant an employee of Defendant WELLPATH and/or the MDOC and worked as a medical professional at LMF. In her capacity as a physician, Defendant WESTCOMB had a duty not to act with serious indifference to Plaintiff's medical needs. She discovered while reviewing the results of Plaintiff's CT Scan that Plaintiff had a 5mm subdural hematoma and failed to provide Plaintiff the proper medical care of which he was in desperate need. She is sued in her individual capacity.

25. Defendant JAMIE KOSKI (KOSKI) is and/or was at all times relevant an employee of the Defendant MDOC and worked as a medical professional at LMF. In her capacity as a registered nurse, Defendant KOSKI had a duty not to act with serious indifference to Plaintiff's medical needs. KOSKI evaluated Plaintiff on January 14, 2022, after Plaintiff sent a medical kite in which he complained of blurry vision, being able to "feel his blood pressure inside his head," dizziness and confusion. KOSKI advised Plaintiff to practice "relaxational breathing and mind exercises" instead of providing Plaintiff with the proper medical care of which he was in desperate need. Two days later Plaintiff was rushed to the hospital where he underwent emergency brain surgery. She is sued in her individual capacity.

26. Defendant JESSICA WRIGHT (WRIGHT), upon information and belief, is and/or was an employee of Defendant MDOC and worked as a medical professional at the MBP. At all times relevant in her capacity as a registered nurse, Defendant WRIGHT had a duty not to act with serious indifference to Plaintiff's medical needs. Defendant WRIGHT worked as an RN where Plaintiff was being

housed at MBP and repeatedly ignored Plaintiff's requests for help despite his inability to stand and walk on his own. She is sued in her individual capacity.

27. Defendant BRENDA JAMES (JAMES) is and/or was at all times relevant an employee of Defendant MDOC and worked as a medical professional at the MBP. Defendant JAMES worked as the nurse supervisor where Plaintiff was being housed at MBP and repeatedly ignored Plaintiff's requests for help despite his inability to stand and walk on his own. She is sued in her individual capacity.

28. Defendant RUTH JONES (JONES) is and/or was at all times relevant an employee of Defendant MDOC and worked as a medical professional at the MBP. Defendant JONES worked as a certified nursing assistant where Plaintiff was being housed at MBP and repeatedly ignored Plaintiff's requests for help despite his inability to stand and walk on his own. She is sued in her individual capacity.

29. Defendant ERIC CHANG (CHANG) is and/or was at all times relevant an employee of WELLPATH and/or the MDOC and worked as a medical professional at the MBP. Defendant CHANG worked as a physician where Plaintiff was being housed at MBP and

repeatedly ignored Plaintiff's requests for help despite his inability to stand and walk on his own. He is sued in his individual capacity.

30. Defendant MICHIGAN DEPARTMENT OF CORRECTIONS (MDOC) is the Michigan state agency responsible for the supervision and custody of approximately 41,000 incarcerated individuals. MDOC operates approximately 31 correctional facilities throughout Michigan that house individuals under MDOC's supervision and custody. The MDOC, through the Correctional Facilities Administration ("CFA"), is responsible for the operations of Michigan's prison system and oversight of the State's approximately 31 correctional facilities, including, inter alia, managing and coordinating educational and work programming at MDOC facilities, and coordinating and monitoring healthcare services for inmates of MDOC facilities. MDOC's administrative offices are located at 206 East Michigan Avenue, Grandview Plaza, Lansing, Michigan 48933.

## **FACTUAL ALLEGATIONS**

31. Plaintiff incorporates by reference paragraphs 1 through 30.

32. Plaintiff was sentenced to 38 months to ten years in the MDOC on May 24, 2021.

33. Plaintiff was placed in LMF sometime around September 9, 2021, where he stayed until January 23, 2022, after which he was transferred to MBP.

34. On or about November 25, 2021, Plaintiff was attacked by another inmate and was knocked unconscious after being struck in the head with an unknown object.

35. Plaintiff was immediately taken to the hospital in Munising, Michigan.

36. Hospital staff examined Plaintiff and gave him a Magnetic Resonance Imaging (MRI) scan after which he was returned to LMF.

37. Defendant WELLPATH at all times relevant provided healthcare in LMF pursuant to a contract and had a duty to provide adequate medical treatment to those in custody at LMF.

38. Defendant WESTCOMB at all times relevant worked as a physician for Defendant WELLPATH in LMF and had a constitutional duty to provide adequate medical treatment to those in custody at LMF.

39. Acting with deliberate indifference to the injury Plaintiff sustained on November 25, 2021, neither Defendant WELLPATH nor Defendant WESTCOMB ordered any follow up care regarding Plaintiff's head injury.

40. Upon his return from the hospital, Plaintiff was placed in segregation.

41. Approximately two weeks later, Plaintiff was released from segregation and placed on the top bunk in a protective custody unit.

42. On December 15, 2021, and on December 21, 2021, Plaintiff submitted healthcare kites requesting to be seen by healthcare due to lightheadedness and sudden loss of balance.

43. A response was sent related to the kite sent on December 21, 2021, indicating that "[y]ou have been listed for a nurse evaluation from your previous kite submitted on 12/15/21. Please watch for your callout."

44. Even though Plaintiff was knocked unconscious and sent to the hospital due to a blow to the head on November 25, 2021, Defendants WELLPATH and WESTCOMB failed to timely provide Plaintiff with reasonable access to a healthcare provider.

45. Plaintiff had an appointment with a kidney specialist[1] on or about December 28, 2021, and was given an ultrasound of his kidneys and a CT scan of his brain to compare to the November 25, 2021, MRI as Plaintiff was still complaining of migraine headaches.

46. On or about January 1, 2022, Plaintiff submitted a medical kite requesting a bottom bunk detail as he was continuing to experience dizziness and loss of balance.

47. On or about January 4, 2022, Plaintiff had a follow up appointment regarding the ultrasound and CT scans he was given on or about December 28, 2022, and was informed by Defendant WESTCOMB that the results of his CT scan showed that he had a 5mm subdural hematoma on the left side of his brain.

48. Defendant WESTCOMB told Plaintiff that she was going to schedule a follow up CT scan with a neurosurgeon but did not tell him when it would be scheduled.

49. Defendant WESTCOMB, following the appointment with Plaintiff, filled out a "Medical Detail Special Accommodations Notice" placing Plaintiff on a bottom bunk restriction on or about January 4, 2022,

---

[1] Plaintiff has been diagnosed with Polycystic Kidney Disease.

but failed to take any steps to either treat or monitor Plaintiff's brain bleed.

50. According to MDOC Policy Directive 04.06.160(G), when a Medical Detail Special Accommodations Notice is issued, the prisoner shall receive a copy.

51. Defendant WESTCOMB failed to provide Plaintiff with a copy of the Medical Detail Special Accommodations Notice, nor did she tell Plaintiff about the bottom bunk restriction and took no subsequent action to ensure that Plaintiff was assigned to a bottom bunk.

52. MDOC Policy Directive 04.06.160(G) further provides that "[a] copy of each Medical Detail and Special Accommodation Notice issued shall be distributed through institutional mail to the housing unit and Record Office for placement in the prisoner's files. A copy also shall be distributed to the Control Center, Classification Director, and, as necessary, to the Property Room."

53. MDOC Policy Directive 04.06.160(H) provides that "BHCS[2] staff shall immediately notify housing unit staff and the Control Center

---

[2] Bureau of Health Care Services.

by telephone whenever a Medical Detail or Special Accommodation Notice is issued that requires immediate attention."

54. Despite Defendant WESTCOMB issuing a Special Accommodation Notice placing Plaintiff on a bottom bunk restriction, Plaintiff continued to be assigned to a top bunk.

55. Defendant CONTRERAS was Assistant Deputy Warden of Housing at LMF at this time and all changes in bunk assignments would have had to have been sent to his attention and approved or denied by Defendant CONTRERAS.

56. Upon information and belief, the Special Accommodation Notice submitted by Defendant WESTCOMB was sent to Defendant CONTRERAS per MDOC policy on or about January 4, 2022.

57. Defendant CONTRERAS, acting with deliberate indifference to Plaintiff's bottom bunk restriction and the danger that placement on a top bunk posed to Plaintiff while he was suffering from sudden loss of balance, ignored the bottom bunk restriction ordered by Defendant WESTCOMB and Plaintiff continued to be assigned to a top bunk.

58. Plaintiff's symptoms of lightheadedness and loss of balance worsened over the next 10 days causing Plaintiff to fall down approximately four or five times. Plaintiff had to be helped by the corrections officers on duty on at least three occasions.

59. On or about January 14, 2022, Plaintiff submitted a healthcare kite in which he complained that his vision was blurry, that he could "feel [his] brain pressure," and that he was feeling confused.

60. Defendant KOSKI, who was a registered nurse working for Defendant MDOC at the time, saw Plaintiff regarding the January 14, 2022, kite and provided that, "[y]ou were seen and evaluated by the nurse today on 1/14/22. Continue to practice the relaxational (sic) breathing and mind exercises per instructed. Re-kite if condition gets worse."

61. Defendants WELLPATH and KOSKI acted with deliberate indifference in responding to Plaintiff's January 14, 2022, kite.

62. Defendant WELLPATH and KOSKI, had direct knowledge that Plaintiff had a 5mm subdural hematoma which was discovered approximately ten days earlier, yet acted with deliberate indifference to the seriousness of Plaintiff's injury by recommending

"relaxational (sic) breathing and mind exercises" instead of taking Plaintiff to get the followup care that he needed.

63. Between January 1, 2022, and January 16, 2022, Plaintiff informed prison staff on approximately five or six different occasions of his falls and lightheadedness, however, prison officials never took any steps to ensure that Plaintiff received medical treatment even though prison staff had witnessed Plaintiff fall down on at least three occasions.

64. Early on January 16, 2022, Plaintiff woke up in excruciating pain and asked his cell mate for help.

65. Plaintiff's head was pounding and he was having trouble seeing.

66. Plaintiff told a corrections officer the symptoms that he was experiencing and was taken to Munising Memorial Hospital where he was given another CT Scan.

67. The results of the CT scan revealed that the brain bleed on the left side of his brain had increased in size and Plaintiff was rushed to Marquette Hospital where he underwent emergency brain surgery.

68. Plaintiff spent the next three to four days in the hospital and was subsequently returned to LMF on or about January 20, 2022.

69. After returning from surgery Plaintiff's mobility was normal, but he continued to experience dizziness.

70. When Plaintiff initially returned to LMF, he was placed in an observation cell overnight.

71. On or about January 21, 2022, Plaintiff was moved back to the general population and assigned to a top bunk, despite the Special Accommodation Notice restricting Plaintiff to a bottom bunk that was submitted on or about January 4, 2022.

72. On or about January 21, 2022, Plaintiff spoke with Defendant WESTCOMB and was told for the first time that he had been on a bottom bunk restriction since on or about January 4, 2022; Defendant WESTCOMB provided Plaintiff with a hard copy of the Special Accommodation Notice.

73. Defendant WESTCOMB assured Plaintiff during their conversation that she would make sure that he got assigned to a bottom bunk.

74. After learning of his bottom bunk restriction, on or about January 21, 2022, Plaintiff informed Defendant COBB, who was a corrections officer working in Plaintiff's unit at the time, that he was supposed

to be assigned to a bottom bunk, however, Defendant COBB ignored Plaintiff's bottom bunk restriction and sent him back to his cell.

75. Later, while Defendant COBB was making his rounds, Plaintiff showed to him the hard copy of the Special Accommodation Notice restricting him to a bottom bunk.

76. Acting with deliberate indifference to Plaintiff's bottom bunk restriction and the danger that placement on the top bunk posed to Plaintiff, Defendant COBB once again ignored Plaintiff's plea for a bottom bunk and told Plaintiff that he would "get to it."

77. On or about January 22, 2022, Plaintiff told Defendant BRENNAN, who was a corrections officer working in Plaintiff's unit at the time, that he had a bottom bunk restriction and asked to be moved off of the top bunk.

78. Defendant BRENNAN, acting with deliberate indifference to Plaintiff's serious medical condition, took no action to comply with Plaintiff's bottom bunk restriction and ignored the danger that placement on the top bunk posed to Plaintiff.

79. On or about January 22, 2022, at lunch time, Plaintiff became dizzy and lost his balance.

80. The corrections officers on duty were able to catch Plaintiff before he fell down and helped him to sit down and brought his food to him so that he did not have to stand in line.

81. The following day, on or about January 23, 2022, Plaintiff still had not been given a bottom bunk assignment and at lunch time when the cell doors opened for the prisoners to move to the cafeteria, Plaintiff lost consciousness and fell from the top bunk, striking his head on the floor.

82. Plaintiff woke up to the corrections officers and medical staff dragging him out of his cell.

83. Plaintiff was immediately taken to Marquette Hospital where he was given another CT scan that revealed that his brain was now bleeding on the right side; the opposite side that was operated on during his first brain surgery.

84. The hospital rushed Plaintiff into another emergency brain surgery.

85. Following Plaintiff's second brain surgery, Plaintiff lost most of his mobility in both of his legs, the ability to control his bowels, and the ability to stand without assistance.

86. As a result of his fall from the top bunk on January 23, 2022, Plaintiff suffered a neurological injury that caused a physical impairment of his legs that required rehabilitation and physical therapy.

87. Plaintiff submitted a grievance regarding the failure to assign Plaintiff to a bottom bunk, however, his grievance was denied at all three steps.

88. Despite his inability to walk, on January 25, 2022, just two days after his second brain surgery, Plaintiff was transferred from the hospital to MBP.

89. Defendant was not placed in an infirmary room when he arrived at MBP, rather he was placed in an observation cell, which is generally reserved for prisoners who are on suicide watch.

90. Plaintiff was told that there were no available beds in the infirmary and that he was only going to be in the observation cell temporarily, however, Plaintiff was kept in the observation cell until on or about July 1, 2022.

91. Following his second brain surgery, Plaintiff required the use of a wheelchair.

92. MDOC Policy Directive 05.01.140(Q) provides that:

> Due to the unique needs of prisoners who are vision or hearing impaired, use wheelchairs, or have other physical disabilities that require barrier-free access to housing and other services, care must be taken to ensure that these prisoners and not placed in institutions that are unable to meet their needs.

93. Plaintiff's observation cell was too small for a wheelchair and it was not properly designed or equipped for disabled inmates requiring the use of a walker and/or wheelchair.

94. Upon information and belief, no attempts were made to transfer Plaintiff to another facility that could accommodate Plaintiff's disability.

95. During the entire time that Plaintiff was being held in the observation cell, he was only allowed to shower approximately 12 times in approximately five months.

96. During the entire time that Plaintiff was being held in the observation cell, he was only given access to cleaning supplies with which he could clean his cell twice in five months.

97. While Plaintiff was housed in the observation cell he was deprived all in-person visits.

98. Plaintiff submitted a grievance regarding his deprivation of in-person visits but his grievance was denied at all three steps.

99. While Plaintiff was housed in the observation cell he was deprived access to commissary.

100. While Plaintiff was housed in the observation cell he was deprived access to JPay.

101. While Plaintiff was housed in the observation cell he was deprived the ability to attend religious services.

102. While Plaintiff was housed in the observation cell he was deprived the ability to go outside to the yard.

103. While Plaintiff was housed in the observation cell he was deprived access to the law library and general library.

104. While Plaintiff was housed in the observation cell he was deprived access to programming.

105. While Plaintiff was housed in the observation cell he was deprived the ability to exercise.

106. During the more than five months that Plaintiff was housed in the observation cell, he would be locked in the cell 24 hours a day, often for several days at a time.

107. The only reason that Plaintiff was housed in the observation cell from January 25, 2022, until approximately July 1, 2022, was because of the disability caused by the fall from the top bunk on January 23, 2022.

108. While Plaintiff was housed in the observation cell, he submitted kites to Defendant JAMES, who was the nursing supervisor at MBP, and spoke with her on several occasions about being moved out of the observation cell and receiving appropriate medical care.

109. Defendant JAMES acted with utter indifference to Plaintiff's health, well-being and constitutional rights.

110. Acting with deliberate indifference to Plaintiff's serious medical condition and to the cruel conditions under which he was being housed on the sole basis of his disability, Defendant JAMES took no action as nursing supervisor to make sure that Plaintiff received the medical care that he desperately needed, or, to have him moved out of the observation cell.

111. During Plaintiff's time in the observation cell, Defendant MDOC denied Plaintiff reasonable accommodations that would allow for him to have access to the privileges afforded to other inmates

housed in the MDOC, including but not limited to, church services, access to the law library, in-person visits, reasonable access to showers, reasonable access to cleaning supplies, JPay, commissary, time in the yard, and the ability to exercise.

112. Plaintiff submitted a grievance seeking a reasonable accommodation for his disability, for reinstatement of privileges, and to be treated humanly, however, his grievance was denied at all three steps.

113. Not only was Plaintiff denied the privileges afforded to other inmates who did not suffer from Plaintiff's disability, but he was also subjected to frequent verbal and physical abuse from MDOC staff.

114. For example, on February 11, 2022, Plaintiff was allowed access to the shower.

115. Plaintiff could not walk without the assistance of a walker or a wheelchair at this time.

116. When Plaintiff arrived to the shower, he found that the shower stool was covered in feces and that there was a fungus on the shower floor.

117. Plaintiff asked for assistance from Defendant JONES, a nurse who was working in the unit at that time, because Plaintiff did not want to step in the feces and fungus, but Defendant JONES refused to help him.

118. Plaintiff had begun to undress when Defendant CAVIN ripped back the shower curtain and grabbed Plaintiff by the back of the neck and slammed him to the ground.

119. Defendant CAVIN then, while attempting to handcuff Plaintiff, kicked him in the back of the head.

120. Defendant CAVIN had not given Plaintiff an order nor exchanged any words with Plaintiff before assaulting him, however, Defendant CAVIN alleged after the incident that he had told Plaintiff to "stand up and return to his cell."

121. During this time, Plaintiff was unable to stand without assistance and would have been physically unable to comply with any order allegedly given to get up and to return to his cell.

122. Defendant CAVIN had direct knowledge of Plaintiff's inability to stand on his own and his inability to walk without the assistance of a walker.

123. After Defendant CAVIN handcuffed Plaintiff's hands behind his back, he then dragged him out of the shower area on his stomach by his arms.

124. Plaintiff was subsequently issued a misconduct ticket for disobeying a direct order.

125. Following a hearing on the misconduct ticket, the hearing officer found him guilty, even though the hearing officer recognized Plaintiff's mobility issues.

126. Plaintiff submitted a grievance against Defendant CAVIN for excessive use of force but his grievance was denied at all three steps.

127. Not only did Plaintiff suffer the physical assault in the shower while he was being housed in the observation cell, but was also subject to frequent verbal abuse.

128. For example, Defendant OGLE routinely degraded Plaintiff based on his race and disability by calling him names such as "crippled ni**er."

129. Defendant JONES told Plaintiff that he deserved to be in his situation and that the prison needed to start treating the prisoners as if it were the 1800s.

130. Defendants NEUBECKER and JONES would regularly tell Plaintiff that he stunk while refusing to give him access to shower, and, refusing to provide him with materials to clean his cell.

131. Plaintiff's mobility was severely limited when he arrived to MBP, and he required assistance getting from his bed to the toilet in his cell.

132. Plaintiff would ask for assistance from Defendants JAMES, JONES, NEUBECKER, OGLE, and CAVIN, but his requests were always ignored and Plaintiff was forced to lie in his own feces for hours waiting for somebody to help him.

133. Defendant MDOC left Plaintiff in an observation cell for over five months, which is one of the most restrictive areas in which a prisoner can be housed, solely because of his disability.

134. Plaintiff timely submitted a grievance regarding his placement in an observation cell, however, his grievance was denied at all three steps.

135. On or about March 3, 2022, Defendant CONTRERAS, the Assistant Deputy Warden of Housing in LMF, came to interview Plaintiff at

MBP regarding Plaintiff falling from the top bunk on January 23, 2022, at LMF.

136. Approximately one week later, an inspector from MBP came to Plaintiff and tried to coerce him into signing some form of waiver of liability regarding the fall from the top bunk on January 23, 2022; Plaintiff refused to sign the document.

137. Defendant MDOC refused to provide a reasonable accommodation for Plaintiff's disability, and instead left him alone in an observation cell which are normally reserved for prisoners on suicide watch and are the most restrictive housing units in the prison.

138. Defendant ERICKSON, acting as an agent/employee of Defendant MDOC, was a Resident Unit Manager at MBP at all relevant times, expressly told Plaintiff that if he would give up his walker he would be moved out of the observation cell. In other words, Defendant ERICKSON made it known that unless Plaintiff could learn to walk again without the assistance of his walker, he was going to sit in the observation cell and continue to be denied the privileges afforded other prisoners.

139. Defendant VIITALA, acting as an agent/employee of Defendant MDOC, was a Resident Unit Manager at MBP at all relevant times, had direct knowledge of Plaintiff's disability and his placement in an observation cell and responded to Plaintiff's grievances about being housed in the observation cell and the inhumane treatment to which he was subjected.

140. Defendant VIITALA, acting with deliberate indifference to Plaintiff's medical needs, and, the inhumane treatment that Plaintiff was subjected to during the approximately five months he was kept locked in an observation cell, refused to either place Plaintiff into an appropriate cell at MBP for a person with his disability as required under MDOC Policy Directive 05.01.140, or to arrange a transfer to another facility that could provide an accommodation for Plaintiff's disability.

141. Defendant PELKY, acting as an agent/employee of Defendant MDOC, was the Assistant Deputy Warden of Housing at MBP at all relevant times and had direct knowledge of Plaintiff's disability and his placement in an observation cell.

142. Defendant PELKY, acting with deliberate indifference to Plaintiff's medical needs, and, the inhumane treatment that Plaintiff was subjected to during the approximately five months he was kept locked in an observation cell, refused to either place Plaintiff into an appropriate cell at MBP for a person with his disability as required under MDOC Policy Directive 05.01.140, or to arrange a transfer to another facility that could provide an accommodation for Plaintiff's disability.

143. As the Assistant Deputy Warden of Housing, Defendant PELKY had the final decision making authority regarding Plaintiff's placement inside of MBP.

144. Plaintiff personally spoke with Defendant PELKY about being housed in the observation cell, his loss of privileges and his need for an accommodation; however, Defendant PELKY, acting with deliberate indifference refused to find an appropriate cell for Plaintiff according to MDOC Policy Directives, or, to arrange to have Plaintiff transferred to another facility.

145. Defendant SCOTT, acting as an agent/employee of Defendant MDOC, was the Health Unit Manager (HUM) at MBP at all

relevant times and had direct knowledge of Plaintiff's disability and his placement in an observation cell.

146. Defendant SCOTT had frequent contact with Plaintiff during the five months that he was housed at MBP in the observation cell and was asked repeatedly for help.

147. Acting with deliberate indifference to Plaintiff's medical needs, and, the inhumane treatment that Plaintiff was subjected to during the approximately five months he was kept locked in an observation cell, Defendant SCOTT refused to arrange to have Plaintiff placed into an appropriate cell at MBP for a person with his disability as required under MDOC Policy Directive 05.01.140.

148. Acting with deliberate indifference to Plaintiff's medical needs, Defendant SCOTT failed to arrange for any meaningful rehabilitative health care that had been recommended after his second brain surgery.

149. Acting with deliberate indifference to Plaintiff's medical needs, Defendant SCOTT further failed to coordinate the necessary resources to effectively care for Plaintiff at MBP.

150. Defendant HUSS, acting as an agent/employee of Defendant MDOC, was the Warden at MBP at all relevant times, had direct knowledge of Plaintiff's disability and his placement in an observation cell and responded to Plaintiff's grievances about being housed in the observation cell and the inhumane treatment to which he was subjected.

151. On or about May 30, 2022, Plaintiff spoke directly with Defendant HUSS regarding his placement in the observation cell since arriving at MBP, the assault he suffered at the hands of Defendant CAVIN, and the denial of certain privileges for the sole reason of his placement in the observation cell, such as commissary and in-person visits.

152. Defendant HUSS, as the Warden of MBP, was responsible for the overall operation of the institution.

153. Defendant HUSS, acting with deliberate indifference, allowed Plaintiff to be housed in an observations cell for approximately five months despite numerous complaints, kites and grievances; some of which were denied by Defendant HUSS herself.

154. Despite having direct knowledge of Plaintiff's loss of privileges, abuse from MDOC staff, and improper housing, Defendant HUSS failed to remedy the improper placement and denial of privileges or to direct the appropriate MDOC staff to find a reasonable accommodation for Plaintiff or to arrange his transfer to a facility that could accommodate his disability in accordance with MDOC Policy Directive 05.01.140.

155. Defendants further denied Plaintiff access to necessary healthcare treatment while he was housed in the observation cell in MBP.

156. Following his second brain surgery, the attending physicians  at Marquette General Hospital recognized and recommended that Plaintiff would likely need to be placed into a rehabilitation facility appointed by the MDOC for gait and balance training.

157. Specifically, attending physicians indicated that Plaintiff would need physical therapy, occupational therapy, and speech therapy in an acute setting, as well as gait and balance training.

158. Despite this recommendation, Defendants MDOC and WELLPATH ignored Plaintiff's dire need for rehabilitate services and only transported him to physical therapy approximately five times

during the five months that he was housed in the observation cell, the first time occurring approximately one month after receiving the recommendation and arriving to MBP.

159. Defendant CHANG, who was a physician working for Defendant WELLPATH at all relevant times, upon information and belief, was Plaintiff's assigned medical provider while he was housed at MBP.

160. Defendant CHANG, saw Plaintiff approximately 10 times while Plaintiff was housed in the observation cell at MBP.

161. Despite Plaintiff's inability to stand on his own or walk without the assistance of a walker, and with deliberate indifference to Plaintiff's injuries and disability, Defendant CHANG failed to order the physical and occupational therapy that was recommended by the hospital staff after his second brain surgery.

162. Defendant CHANG, acting with deliberate indifference to Plaintiff's injuries and recent brain surgeries, failed to provide the appropriate after care to ensure that the fluid on Plaintiff's brain had cleared and/or that Plaintiff's brain was no longer bleeding.

163. Finally, on or about July 1, 2022, after spending more than five months in an observation cell, MBP transferred Plaintiff to Chippewa Correctional Facility.

## Count I
## 42 U.S.C. §1983
## Eighth Amendment Violations
## (against Defendants CONTRERAS, BRENNAN, KOSKI, and COBB)

164. Plaintiff incorporates by reference paragraphs 1 through 163.

165. The Eighth Amendment of the U.S. Constitution provides, in pertinent part, that excessive bail may not be required nor excessive fines be imposed nor cruel and unusual punishments be inflicted.

166. Plaintiff was entitled to all rights, privileges and immunities accorded to all incarcerated citizens of the State of Michigan and the United States.

167. At all times relevant, Defendants were acting within the course and scope of their employment with the State of Michigan and the Department of Corrections and/or LMF and/or MBP and were acting under color of state law with the authority granted to them as corrections officers or correctional health care providers and/or managers and/or shift supervisors.

168. Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff had a right to be free from cruel and unusual punishment while incarcerated and under the custody and control of the State of Michigan at LMF and at MBP.

169. At all relevant times, Plaintiff had a right to adequate and sufficient medical care and/or treatment such that his life would be preserved and he at all times would be free from needless unjustified and preventable pain, suffering and deterioration of his health and well-being.

170. Defendant KOSKI, acted with deliberate indifference to Plaintiff's wellbeing when she responded to Plaintiff's healthcare kite on January 14, 2022, in which he complained that he could "feel [his] brain pressure" by recommending "relaxational (sic) breathing and mind exercises" instead of taking Plaintiff to get the followup care that he needed.

171. Defendant Koski had direct knowledge that Plaintiff had a 5mm subdural hematoma and acted with deliberate indifference to Plaintiff's healthcare needs the result of which was Plaintiff having

to undergo an emergency brain surgery two days later on January 16, 2022.

172. Defendants CONTRERAS, BRENNAN, and COBB, acting with deliberate indifference to Plaintiff's wellbeing, ignored a bottom bunk assignment entered on or about January 4, 2022, despite Plaintiff experiencing dizziness, repeatedly falling down, and undergoing emergency brain surgery on January 16, 2022.

173. Plaintiff asked Defendants BRENNAN and COBB on multiple occasions to be placed on a bottom bunk in accordance with the Special Accommodation Notice submitted by Defendant WESTCOMB on January 4, 2022, on the account of multiple episodes of losing his balance and falling, however Defendants COBB and BRENNAN, acting with deliberate indifference to the serious risk of injury posed by assignment to a top bunk, ignored Plaintiff's requests as well as the bottom bunk restriction that entered on January 4, 2022.

174. Defendant CONTRERAS, as Assistant Deputy Warden of Housing at LMF, had to approve all bunk assignments at LMF, and despite the Special Accommodation Notice restricting Plaintiff to a bottom

bunk that was sent to him on January 4, 2022, Plaintiff's multiple falls, dizziness, and loss of balance, and acting with deliberate indifference to the danger posed to Plaintiff being assignment to a top bunk, Defendant CONTRERAS left Plaintiff assigned to a top bunk for approximately three weeks after receiving the Special Accommodation Notice, even after Plaintiff's first emergency brain surgery on January 16, 2022.

175. Due to Defendants deliberate indifference to Plaintiff's serious medical needs, Plaintiff was never assigned to a bottom bunk and fell from the top bunk after losing consciousness on or about January 23, 2022, hitting his head on the floor, causing Plaintiff to undergo a second emergency brain surgery leading to Plaintiff losing the ability to stand or walk without assistance.

176. As a direct and proximate cause of these actions and omissions, Plaintiff has suffered, and will continue to suffer great mental anguish, physical pain and suffering, humiliation, hardship, anxiety, and distress.

WHEREFORE, Plaintiff respectfully requests compensatory non-economic and economic damages, including but not limited to all

damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of Michigan, including but not limited to punitive damages, reasonable attorney fees pursuant to 42 U.S.C. § 1988, costs and interests, and such other relief as appears reasonable and just under the circumstances.

**Count II**
**42 U.S.C. §1983**
**Eighth Amendment Violations**
**(against Defendants HUSS, PELKY, SCOTT, ERICKSON,**
**VIITALA, OGLE, JAMES, JONES, and NEUBECKER)**

177. Plaintiff incorporates by reference paragraphs 1 through 176.

178. At all times relevant, Defendants HUSS, SCOTT, PELKY, ERICKSON, VIITALA, OGLE, and NEUBECKER were acting within the course and scope of their employment with the State of Michigan and the Department of Corrections and/or MBP and were acting under color of state law with the authority granted to them as corrections officers and/or manager and/or shift supervisor.

179. At all relevant times, Plaintiff had a right to humane living conditions, including access to hygiene products, showers, and clean and sanitary housing.

180. At all relevant times, Plaintiff had a right to necessary medical care.

181. Defendants HUSS, PELKY, SCOTT, ERICKSON, VIITALA, OGLE, JAMES, JONES, and NEUBECKER acted with deliberate indifference to Plaintiff's medical needs, causing an unnecessary and wanton infliction of pain by denying him occupational, physical, and speech therapy as recommended by the treating physicians at Marquette General Hospital following Plaintiff's second brain surgery, and instead, locked Plaintiff in an observation cell for approximately five months, refusing to assist him with the most basic needs, such as bathing and using the toilet.

182. By their policies and practices described herein, Defendants HUSS, SCOTT, PELKY, ERICKSON, VIITALA, OGLE, JAMES, JONES and NEUBECKER deprived Plaintiff of the minimal civilized measure of life's necessities, and violated his basic human dignity and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution for each of the reasons set forth herein.

183. Defendants HUSS, SCOTT, PELKY, ERICKSON, VIITALA, OGLE, JAMES, JONES, and NEUBECKER had been aware of all deprivations complained of herein and had condoned or been deliberately indifferent to such conduct.

184. Defendants HUSS, SCOTT, PELKY, ERICKSON, VIITALA, OGLE, JAMES, JONES, and NEUBECKER also had been aware of the substantial risk of harm caused by these deprivations and failed to eliminate this risk of harm in the more than five months that Plaintiff was locked in the observation cell at MBP.

185. It should have been obvious to Defendants HUSS, SCOTT, PELKY, ERICKSON, VIITALA, OGLE, JAMES, JONES, and NEUBECKER, and to any reasonable person, that the conditions imposed on Plaintiff cause tremendous mental anguish, physical harm, suffering, and pain to such individuals.

186. Defendant JAMES, who was the nursing supervisor at MBP, and who spoke with Plaintiff on several occasions about Plaintiff's desire to be moved out of the observation cell and receiving appropriate medical care, had direct knowledge of Plaintiff's serious medical needs and acted with utter/deliberate indifference to Plaintiff's

health, well-being and constitutional rights, by taking no actions as nursing supervisor to make sure that Plaintiff received the medical care that he desperately needed, or, to have him moved out of the observation cell and into a cell where his medical needs could be met.

187. Further, Defendants OGLE and NEUBECKER subjected Plaintiff to humiliation and degradation by routinely telling Plaintiff, among other things, that he "stinks," by calling him a "crippled ni\*\*er," and by telling him that he deserves to be in his disabled condition.

188. As a direct and proximate cause of these actions and omissions, Plaintiff has suffered, and will continue to suffer great mental anguish, physical pain and suffering, humiliation, hardship, anxiety, and distress.

WHEREFORE, Plaintiff respectfully requests compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of Michigan, including but not limited to punitive damages, reasonable attorney fees pursuant to 42 U.S.C. §

1988, costs and interests, and such other relief as appears reasonable and just under the circumstances.

**Count III**
**42 U.S.C. §1983**
**Eighth Amendment Violations**
**(excessive use of force - against Defendant CAVIN)**

189. Plaintiff incorporates by reference paragraphs 1 through 188.

190. At all times relevant, Defendant CAVIN was acting within the course and scope of his employment with the State of Michigan and the Department of Corrections and/or MBP and was acting under color of state law with the authority granted to him as a corrections officer and/or manager and/or shift supervisor.

191. Pursuant to the Eighth Amendment of the United States Constitution, Plaintiff had a right to be free from cruel and unusual punishment while incarcerated and under the custody and control of the State of Michigan at MBP.

192. On or about February 11, 2022, Defendant CAVIN maliciously and sadistically slammed Plaintiff to the ground in the shower in an attempt to cause Plaintiff harm after Plaintiff had complained about the shower stool and floor being covered in feces and fungus.

193. Defendant CAVIN's use of force was wanton and unnecessary for any legitimate penal interest as Plaintiff did not represent any threat to Defendant CAVIN, nor to the prison as Plaintiff's disability prevented him from standing on his own or walking without the assistance of a walker.

194. Defendant CAVIN acted in reckless disregard for Plaintiff's rights constituting willful violations of the Eighth and Fourteenth Amendments to the Constitution of the United States.

195. As a direct and proximate result of Defendant CAVIN's foregoing wrongful acts, Plaintiff has been hurt and injured in his health, strength, activity and nervous system, all of which have caused and continue to cause him great mental, physical and nervous pain and suffering, humiliation, hardship, anxiety, distress and anguish.

196. In doing the foregoing wrongful acts, Defendant CAVIN acted in reckless and callous disregard for the constitutional rights of Plaintiff. The wrongful acts were willful, oppressive, fraudulent and malicious, thus warranting the award of punitive damages against this individual defendant in an amount adequate to punish his wrongdoing and to deter future misconduct.

WHEREFORE, Plaintiff respectfully requests compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of Michigan, including but not limited to punitive damages, reasonable attorney fees pursuant to 42 U.S.C. § 1988, costs and interests, and such other relief as appears reasonable and just under the circumstances.

**Count IV**
**42 U.S.C. §1983**
**Eighth Amendment Violations**
**(*Monell claim* - against Defendant WELLPATH)**

197. Plaintiff incorporates by reference paragraphs 1 through 196.

198. Defendant WELLPATH was engaged in offering medical care and attention, facilities and supplies to inmates, including Plaintiff herein, at LMF and MBP, and employs various physicians and medical personnel within LMF and MBP.

199. At all times relevant herein, Defendant WELLPATH held itself out, pretended and otherwise informed LMF and MBP's inmates, and more particularly, in the instance of Plaintiff, that Defendant WELLPATH had and possessed the requisite skill, know-how,

facilities, personnel, equipment and information to properly care for and treat Plaintiff.

200. At all times relevant to the Complaint, Plaintiff was imprisoned at LMF and MBP and was placed under the custody, ward, care and supervision of LMF and MBP prisons and Defendant WELLPATH, and its physicians, staff, supervisors, employees, agents and apparent agents, including but not limited to, Defendants WESTCOMB and CHANG.

201. Plaintiff possessed no medical or professional medical knowledge, nor did he have the facilities to care for, mend or cure himself.

202. At all times relevant herein, Plaintiff was an inmate and dependent upon and under the control of LMF and MBP prisons and Defendant WELLPATH and its physicians, staff, supervisors, employees, agents and apparent agents, including but not limited to, Defendants WESTCOMB and CHANG; and that Plaintiff, as a prisoner, was deprived of his normal opportunities for protection, treatment and care.

203. At all times mentioned herein, Defendants WESTCOMB and CHANG, were medical professionals duly licensed under the laws of

the State of Michigan, and an employee, medical professional, agent and/or apparent agent, of Defendant WELLPATH and as such practiced their profession in the medical facilities of LMF and MBP pursuant to their employment.

204. Defendant WELLPATH offered and provided said medical care and services at LMF and MBP correctional facilities pursuant to a contract with the MDOC.

205. The contract between Defendant WELLPATH and the MDOC was in effect at all times relevant herein.

206. Under the contract between Defendant WELLPATH and the MDOC, it was the duty of the Defendant WELLPATH to institute, allow and/or maintain customs, policies and/or practices that render medical services consistent with the constitutional necessities of the prisoners therein, so as not to cause injury to said patients and prisoners, including Plaintiff; and to institute, allow and/or maintain customs, policies and/or practices that do not cause or display an utter indifference to the health, well-being and constitutional rights of said patients and prisoners, including Plaintiff.

207. At all times material herein, Plaintiff cooperated fully with Defendant WELLPATH and its duly authorized agents, apparent agents, physicians, servants, and/or employees, including but not limited to, Defendants WESTCOMB and CHANG.

208. At all times material herein, Plaintiff was experiencing symptoms and/or signs of a closed head injury, including but not limited to: dizziness, lightheadedness, loss of balance, migraine headaches, and sudden falls, during his incarceration at LMF.

209. As a direct and proximate result of Defendant WELLPATH's customs, policies and/or practices, Defendant WELLPATH encouraged, permitted, caused and allowed: an utter and/or deliberate indifference towards the health, well-being and constitutional necessities of Plaintiff; an inexplicable delay and/or lack of treatment for Plaintiff which served no penological interest; a failure to timely and/or properly and adequately diagnose, treat and/or provide medical treatment for Plaintiff's medical condition, including but not limited to, a 5mm subdural hematoma, lightheadedness, loss of balance, migraine headaches, and sudden

falls, while he was incarcerated at LMF; to wit, on and after November 25, 2022:

(a) The Defendants knew that Plaintiff was experiencing symptoms and/or signs of a closed head injury, including but not limited to: dizziness, lightheadedness, loss of balance, migraine headaches, and sudden falls, for at least four weeks prior to the first emergency brain surgery on January 16, 2022;

(b) Following Plaintiff's first brain surgery, he continued to experience symptoms and/or signs of a closed head injury, including but not limited to: dizziness, lightheadedness, loss of balance, migraine headaches, and sudden falls, through January 23, 2022;

(c) Defendants knew that Plaintiff was experiencing continued symptoms and/or signs of a closed head injury, including but not limited to: dizziness, loss of balance, headaches, confusion and forgetfulness, through July 1, 2022, including but not limited to documenting these symptoms at his medical encounters on or about December 15, 2021, December 21, 2021, January 6, 2022, January 14, 2022, January 22, 2022, March 12, 2022, and March

14, 2022, as well as daily through his January 16, 2022, admission and January 23, 2022, admission to Municing and Marquette Hospitals.

(d) Plaintiff was not seen or treated by a physician between January 4, 2022, when Defendant WELLPATH discovery the 5mm subdural hematoma, until having to be taken to the hospital and rushed into emergency brain surgery on January 16, 2022, even though Defendants knew that Plaintiff was experiencing continued symptoms and/or signs of a closed head injury, including but not limited to a subdural hematoma on the brain.

(e) The Defendants knew or should have known said continuing symptoms and/or signs of a subdural hematoma posed serious and/or substantial risks to the health and well-being of Plaintiff if not properly treated or if left untreated or undiagnosed, including but not limited to: sudden falls, dizziness, lightheadedness, stroke, paralysis and possibly death;

(f) Despite the Defendants' aforesaid knowledge of said symptoms and serious and substantial risks to Plaintiff, the

Defendants, in following or practicing one or more of the aforementioned widespread practices, customs and/or policies:

i. Failed to properly and adequately monitor Plaintiff's medical condition in utter and/or deliberate indifference of said risks; or

ii. Failed to properly and adequately alleviate, treat and/or control Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks; or

iii. Improperly and inadequately treated and/or attended to Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks; or

iv. Failed to properly and adequately and/or timely diagnose Plaintiff's chronic subdural hematoma due to his dizziness and sudden falls in utter and/or deliberate indifference of said risks; or

v. Refused to provide physical and occupational therapy along with gait and balance training in spite of continued and/or unresolved symptoms and/or signs of unsteady, abnormal gait in utter and/or deliberate indifference of said risks.

vi. Failed to ensure that Plaintiff was placed on a bottom bunk after learning of Plaintiff's subdural hematoma, despite Plaintiff

being placed on a bottom bunk restriction by Defendant WESTCOMB on or about January 4, 2022.

210. As a direct and proximate result of one or more of the aforementioned customs, policies and/or practices of the Defendants that encouraged, permitted, caused and allowed the aforementioned deliberately indifferent actions of Defendant WELLPATH, Plaintiff was deprived and/or discontinued from necessary medical treatment in violation of his Eighth Amendment Rights and was thereby injured, including but not limited to: two severe brain injuries causing disability.

211. That as a direct and proximate result of one or more of the aforementioned customs, policies and/or practices of the Defendants that encouraged, permitted, caused and allowed the aforementioned deliberately indifferent actions of the Defendant WELLPATH, Plaintiff was then and there injured both internally and externally; that he suffered and continues to suffer from severe and permanent injuries, including but not limited to: permanent brain injury; that he sustained a severe shock and damage to his nervous system and other systems of his body; that he suffered and continues to

suffer from loss of a normal life; that he suffered and continues to suffer from acute and prolonged physical and mental pain and suffering; that the risk or harm of injury, including but not limited to permanent brain damage, was increased; that his medical condition worsened and his chance of recovery was diminished; Plaintiff will suffer from wage loss and became liable for great sums of money for medical, hospital care and treatment, and attendant care, as well as incurring other expenses.

212. Plaintiff is entitled to his costs and reasonable attorney's fees incurred herein pursuant to 42 U.S.C.A. § 1988.

WHEREFORE, the Plaintiff, prays judgment against Defendant WELLPATH for said sum for medical, drug, and incidental expenses, and, for compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of Michigan, including but not limited to punitive damages, reasonable attorney fees pursuant to 42 U.S.C. § 1988, costs and interests, and such other relief as appears reasonable and just under the circumstances.

**Count V**
**42 U.S.C. §1983**
**Eighth Amendment Violations**
(***Monell claim* - against Defendants WESTCOMB and CHANG)**

213. Plaintiff incorporates by reference paragraphs 1 through 212.

214. That at all times mentioned herein, the Defendants WESTCOMB and CHANG were medical professionals licensed under the laws of the State of Michigan, and as such practiced their professions in the medical facilities of LMF and MBP.

215. During all times relevant, and for some time prior and subsequent thereto, Plaintiff was imprisoned at LMF and MBP and was placed under the custody, ward, care and supervision of the Defendants WESTCOMB and CHANG.

216. Plaintiff possessed no medical or professional medical knowledge, nor did he have the facilities to care for, mend or cure himself.

217. At all times material herein, Plaintiff was an inmate and dependent upon and under the control of LMF and MBP and Defendants WESTCOMB and CHANG and that Plaintiff, as a prisoner, was deprived of his normal opportunities for protection, treatment and care.

218. At all times material herein, Defendants WESTCOMB and CHANG did attend to and treat Plaintiff while he was a prisoner at LMF and MBP.

219. At all times material herein, Plaintiff cooperated fully with Defendants WESTCOMB and CHANG.

220. It then and there became and was the duty of the Defendants WESTCOMB and CHANG to render medical services consistent with the constitutional necessities of the prisoners therein, so as not to cause injury to said patients and prisoners, including Plaintiff, and to not display an utter indifference to the health, well-being and constitutional rights of said patients and prisoners, including Plaintiff.

221. At all times material herein, Plaintiff was experiencing symptoms and/or signs of a closed head injury, including but not limited to: dizziness, loss of balance, headaches, confusion and forgetfulness during his incarceration at LMF.

222. At all times material herein, notwithstanding its aforesaid duties, while Plaintiff was incarcerated at LMF and MBP, Defendants WESTCOMB and CHANG with an utter and/or deliberate

indifference towards the health and well-being of Plaintiff, and in an inexplicable delay and/or lack of treatment for Plaintiff which served no penological interest, failed to timely and/or properly and adequately diagnose, treat and/or provide medical treatment for Plaintiff's medical condition, including but not limited to, a subdural hematoma, dizziness, loss of balance, migraine headaches, confusion, and forgetfulness while he was incarcerated at LMF and MBP; to wit, on and after November 25, 2021.

(a) Defendants knew that Plaintiff was experiencing symptoms and/or signs of a closed head injury, including but not limited to: dizziness, lightheadedness, loss of balance, migraine headaches, and sudden falls for at least four weeks prior to the first emergency brain surgery on January 16, 2022;

(b) Plaintiff continued to experienced symptoms and/or signs of a closed head injury, including but not limited to: dizziness, loss of balance, headaches, confusion and forgetfulness, through July 1, 2022;

(c) Defendants knew that Plaintiff was experiencing continued symptoms and/or signs of a closed head injury, including but not

limited to: dizziness, loss of balance, headaches, confusion and forgetfulness, through July 1, 2022, including but not limited to documenting these symptoms at his medical encounters on or about December 15, 2021, December 21, 2021, January 6, 2022, January 14, 2022, January 22, 2022, March 12, 2022, and March 14, 2022, as well as daily through his January 16, 2022, admission and January 23, 2022, admission to Munching and Marquette Hospitals.

(d) Defendant knew or should have known said continuing symptoms and/or signs of a closed head injury posed serious and/or substantial risks to the health and well-being of Plaintiff if not properly treated or if left untreated or undiagnosed, including but not limited to: sudden falls, dizziness, lightheadedness, stroke, paralysis and possibly death;

(e) Despite Defendants' aforesaid knowledge of said symptoms and serious and substantial risks to Plaintiff, Defendants:

i. Failed to properly and adequately monitor Plaintiff's medical condition in utter and/or deliberate indifference of said risks; or

ii. Failed to properly and adequately alleviate, treat and/or control Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks; or

iii. Improperly and inadequately treated and/or attended to Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks; or

iv. Failed to properly and adequately and/or timely diagnose disabled Plaintiff's closed head injury due to dizziness, loss of balance, headaches, confusion and forgetfulness in utter and/or deliberate indifference of said risks; or

v. Refused to provide physical and occupational therapy along with gait and balance training in spite of continued and/or unresolved symptoms and/or signs of unsteady, abnormal gait in utter and/or deliberate indifference of said risks.

vi. Failed to ensure that Plaintiff was placed on a bottom bunk after learning of Plaintiff's subdural hematoma, despite Plaintiff being placed on a bottom bunk restriction by Defendant WESTCOMB on or about January 4, 2022.

223. As a direct and proximate result of the deliberately indifferent actions of Defendants WESTCOMB and CHANG, Plaintiff was deprived and/or discontinued from necessary medical treatment in violation of his Eighth Amendment Rights and was thereby injured, including but not limited to: two severe brain injuries causing disability.

224. As a direct and proximate result of the deliberately indifferent actions of the Defendants WESTCOMB and CHANG, Plaintiff was then and there injured both internally and externally; that he suffered and continues to suffer from severe and permanent injuries, including but not limited to: permanent brain injury; that he sustained a severe shock and damage to his nervous system and other systems of his body; that he suffered and continues to suffer from loss of a normal life; that he suffered and continues to suffer from acute and prolonged physical and mental pain and suffering; that the risk or harm of injury, including but not limited to permanent brain damage, was increased; that his medical condition worsened and his chance of recovery was diminished; that Plaintiff will suffer from wage loss and became liable for great sums

of money for medical, hospital care and treatment, and attendant care, as well as incurring other expenses.

225.Plaintiff is entitled to his costs and reasonable attorney's fees incurred herein pursuant to 42 U.S.C.A. § 1988.

WHEREFORE, the Plaintiff, prays judgment against Defendants WESTCOMB and CHANG for said sum for medical, drug, and incidental expenses, and, for compensatory non-economic and economic damages, including but not limited to all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of Michigan, including but not limited to punitive damages, reasonable attorney fees pursuant to 42 U.S.C. § 1988, costs and interests, and such other relief as appears reasonable and just under the circumstances.

## Count VI
## Discrimination on the Basis of a Disability in Violation of the Americans with  Disability Act (42 U.S.C. 12101, et seq.) (Against DEFENDANT - MDOC)

226.Plaintiff incorporates by reference paragraphs 1 through 225.

227.The purpose of the Americans with Disabilities Act ("ADA") is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."

42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

228. Plaintiff's claims under the ADA are brought against Defendant MDOC as a department, agency, or instrumentality of the State of Michigan.

229. Defendant MDOC is a "public entity" within the meaning of 42 U.S.C. § 12131(1)(B).

230. Plaintiff is a qualified individual with a disability as defined in the ADA. He has a mental and physical impairment that substantially limits one or more major life activity, he has records of such impairments, or he is regarded as having such impairments. Plaintiff meets the essential eligibility requirements for the receipt of services of the participation in programs and activities provided by Defendants. 42 U.S.C. § 12102(2); 42 U.S.C § 12131(2).

231. By the actions of the Defendant described above, Plaintiff has, by reason of such disability, been "excluded from participation in or

be[en] denied the benefits of the services, programs, or activities of public entities and have been subjected to discrimination by public entities," in violation of Title II of the ADA, 42 U.S.C. § 12132.

232. Plaintiff is qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in the MDOC's custody within the meaning of Title II of the ADA.

233. At all times relevant to this action, the ADA was in full force and effect in the United States and Plaintiff had a right not to be subjected to discrimination on the basis of his disability by Defendants. 42 U.S.C. § 12132.

234. Defendant MDOC, as a public entity as defined under 42 U.S.C. § 12131(1)(A), has an affirmative duty to create policies and procedures to prevent discrimination based on disability.

235. Plaintiff suffered two serious brain injuries while incarcerated within the MDOC and these injuries substantially limited his motor skills, prohibited him from walking or standing without assistance, and further caused problems with vision, loss of balance, severe headaches and pain.

236. Following Plaintiff's second brain surgery, he was transferred to MBP where he was placed in an observation cell for more than five months solely on account of his disability.

237. Defendants' actions, of placing Plaintiff in an observation cell and refusing to provide him a reasonable accommodation, denied Plaintiff the benefits of the services, programs, and activities of a public entity based on his disability.

238. Defendants' unlawful deprivation of Plaintiff's rights included, but were not limited to, depriving him of the following: access the the law library, access to religious services, access to sanitary living accommodations and a clean cell, access to regular showering and bathing, access to the cafeteria, access to the commissary, access to go outside into the "yard" for fresh air, access to any MDOC educational classes or programs, access to any form of exercise, access to use JPay prison phone system, access to a cell that was designed and equipped for his medical disability, the use of a wheelchair, and the access to proper health care and physical therapy.

239. Plaintiff was entitled to participate in the daily activities afforded to other inmates without disabilities, however, as a result of Defendants' policies and practices regarding individuals with disabilities, Plaintiff was unnecessarily placed and retained in isolation due to his disabilities; was denied equal access to activities, programs, and services for which he was otherwise qualified; and was denied the opportunity to receive services in the most integrated setting appropriate to his needs.

240. Defendant MDOC, through its agents, acted intentionally, willfully, and with reckless disregard for Plaintiff's constitutional rights under the ADA and the Due Process Clause of the Fourteenth Amendment (incorporating the Eight Amendment).

241. Plaintiff filed numerous grievances for Defendants' violations of his rights under the ADA and the U.S. Constitution.

242. Defendants denied all of Plaintiff's requests for reasonable accommodations.

243. As a result of Defendants' policies and practices regarding individuals with disabilities, Plaintiff was unnecessarily placed and retained in isolation due to his disabilities; was denied equal access

to activities, programs, and services for which he was otherwise qualified; and was denied the opportunity to receive services in the most integrated setting appropriate to his needs.

244. As a proximate result of Defendants' violations of Plaintiff's rights under the ADA, Plaintiff has suffered, and continues to suffer, from discrimination, unequal treatment, exclusion (including exclusion from Defendant MDOC's services, benefits, activities, programs, and requirements), financial loss, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, unnecessary loss of rights and privileges, including unnecessary disciplinary measures, and injury to their health.

WHEREFORE, Plaintiff, prays judgment against Defendant MDOC for said sum for medical, drug, and incidental expenses and for general damages according to proof, costs and attorney's fees, and for such other and further relief as this court deems just and proper.

## COUNT VI
### Discrimination on the Basis of a Disability in Violation of the Rehabilitation Act. (29 U.S.C. §794 et seq.)
### (Against DEFENDANT - MDOC)

245. Plaintiff incorporates by reference paragraphs 1 through 244.

246. The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .... " 29 U.S.C. § 794(a).

247. The claims under the Rehabilitation Act are brought against Defendant MDOC as a department, agency, or instrumentality of the State of Michigan.

248. Defendant receive Federal financial assistance within the meaning of 29 U.S.C. § 794(a).

249. The operations of Defendant are programs or activities within the meaning of 29 U.S.C. § 794(b).

250. Plaintiff is an "individual with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

251. As a proximate result of Defendants' violations as specifically described above of Plaintiff's rights under the Rehabilitation Act, Plaintiff has suffered, and continues to suffer, from discrimination, unequal treatment, exclusion (including exclusion from Defendants'

services, benefits, activities, programs, and requirements), financial loss, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, unnecessary loss of rights and privileges, including unnecessary disciplinary measures, and injury to their health.

WHEREFORE, the Plaintiff, prays judgment against Defendant MDOC for said sum for medical, drug, and incidental expenses and for general damages according to proof, costs and attorney's fees, and for such other and further relief as this court deems just and proper.

Respectfully submitted,

THE NUNLEY LAW GROUP, PLLC.

Date:November 7, 2022.          /s/_____*Royce A. Nunley*_____

Royce Nunley (P79906)
Joshua Hadley (P80080)
Attorneys for Plaintiff
21929 Harper Ave.
St. Clair Shores, MI. 48080
phone. (586) 778-4555

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

AMON ALEXANDER-HASSAN WILLIS,

      Plaintiff,

No.2:22-cv-211
Hon. Maarten Vermaat

v.

ERICA HUSS; MARK CAVIN; MEGAN
NEUBECKER; DREW OGLE; UNKNOWN
BRENNAN; UNKNOWN COBB; JEFFREY
CONTRERAS; KEITH PELKY; CHARLIE
SCOTT; PEGGY ERICKSON; DARRIN
VIITALA; AMY WESTCOMB; JAMIE KOSKI;
BRENDA JAMES; RUTH JONES; AND
ERIC CHANG; in their individual capacities,
and WELLPATH, LLC.; and
MICHIGAN DEPARTMENT OF
CORRECTIONS,
          Defendants.

_____

THE NUNLEY LAW GROUP, PLLC
ROYCE A. NUNLEY (P79906)
JOSHUA HADLEY (P80080)
Attorneys for Plaintiff
21929 Harper Ave.
St. Clair Shores, MI 48080
(586) 778-4555
fax. 866-512-5488
royce@roycenunleylaw.com
josh@roycenunleylaw.com

## **DEMAND FOR JURY TRIAL**

NOW COMES, the above-named Plaintiff, by and through his attorneys, THE NUNLEY LAW GROUP, PLLC., and hereby makes formal demand for a trial by jury of the facts and issues involved in this cause of action.

Respectfully submitted,

THE NUNLEY LAW GROUP, PLLC.

Date: December 20, 2022.        /s/_____*Royce A. Nunley*_____

Royce Nunley (P79906)
Joshua Hadley (P80080)
Attorneys for Plaintiff
21929 Harper Ave.
St. Clair Shores, MI. 48080
phone. (586) 778-4555