UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AMON ALEXANDER-HASSA WILLIS,                   Case No. 2:22-cv-00211

        Plaintiff,                                   Hon.   Paul L. Maloney
                                                    U.S. District Judge

      v.

ERICA HUSS, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R&R) addresses three motions to dismiss and a motion for partial summary judgment.   Defendant Wellpath, LLC, filed two motions to dismiss (ECF Nos. 44 and 51), and Defendant Jones filed her second motion to dismiss (ECF No. 48).   In addition, Defendants Huss, Neubecker, Ogle, Contreras, Pelky, Scott, Viitala, Koski, and Wright filed a motion for partial summary judgment.   (ECF No. 53.)

This is a civil rights action brought by state prisoner Amon Alexander-Hassa Willis pursuant to 42 U.S.C. § 1983.   Willis alleges violations of his rights under the Eighth Amendment, as well as violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).

On November 9, 2022, Willis, through counsel, filed his original complaint. (ECF No. 1.)   On November 18, 2022, the case was removed from early mediation.

(ECF No. 6.)   Willis filed his first amended complaint on December 20, 2022.   (ECF No. 14.)   The first amended complaint was 72 pages long and named nineteen Defendants.   (*Id.*)   Three of the Defendants – Jones, Chang, and Westcomb – filed motions to dismiss.   (ECF Nos. 25 and 26.)

On April 21, 2023, the undersigned filed an R&R recommending that the Court deny Defendants Chang and Westcomb's motion to dismiss and grant in part and deny in part Defendant Jones's motion to dismiss.   (ECF No. 42, PageID.409.)   As to Defendant Jones, it was recommended that the Court dismiss all claims against Jones except for "Willis's claim (set forth primarily in ¶ 132) that Defendant Jones failed to assist Willis and caused him to lie in his own feces for hours on an unspecified date or dates."   *Id.* (referencing ¶ 132 of Willis's amended complaint, ECF No. 14, PageID.156).)   It was further recommended that the Court order Willis to file an amended complaint that complied with Fed. R. Civ. P. 8.   *Id.*   On May 15, 2023, the Court adopted the R&R and ordered Willis to file an amended complaint that complied with Rule 8 of the Federal Rules of Civil Procedure within 21 days.   (ECF No. 45.)

On June 5, 2023, Willis filed a longer *78-page* second amended complaint naming the same nineteen Defendants.   The second amended complaint is essentially identical to the first amended complaint, but longer.   The nineteen Defendants are:

1.  Marquette Branch Prison (MBP) Warden Huss,

2.  MBP Corrections Officer (CO) Cavin,

3.  MBP CO Neubecker,

4.  MBP CO Ogle,

5.  Alger Corrections Facility (LMF) CO Brennan,

6.  LMF CO Cobb,

7.  LMF Assistant Deputy Warden (ADW) Contreras,

8.  MBP ADW Pelky,

9.  MBP Health Unit Manager (HUM) Scott,

10. MBP Resident Unit Manager (RUM) Erickson,

11. MBP RUM Viitala,

12. Wellpath, Inc. (Wellpath),

13. Physician's Assistant (PA) Westcomb,

14. LMF registered nurse (RN) Koski,

15. MBP RN Wright,

16. MBP Nurse Supervisor James,

17. MBP Nursing Assistant (NA) Jones,

18. Dr. Chang, and

19. the Michigan Department of Corrections (MDOC).

It is respectfully recommended that the Court deny NA Jones's motion to dismiss (ECF No. 48), deny Wellpath's motion to dismiss the first amended complaint (ECF No. 44) as moot, and grant Wellpath's motion to dismiss the second amended complaint (count IV) (ECF No. 51) against Wellpath.

It is further recommended that the Court grant Defendants Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright's motion for partial summary judgment (ECF No. 53) due to Willis's failure to exhaust his administrative remedies. And further, the undersigned recommends that the Court grant the motion in part and deny the motion in part as to Defendant Huss, by dismissing all claims against her except for Willis's claim that Huss denied him visitation privileges while he was housed in an observation cell.

If the Court adopts these recommendations, the following claims in the second amended complaint will remain in the case:

1. Count I against Defendants Brennan and Cobb;

2. Count II against Defendants Huss (limited to visitation), Jones (limited to causing Willis to lie in his own feces), Erickson, and James;

3. Count III against Defendant Cavin;

4. Count V against Defendant Westcomb and Chang; and

5. Counts VI and VII against Defendant MDOC.

In addition, if the Court adopts these recommendations, Count IV will be dismissed in its entirety, and Wellpath, Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright will be dismissed from the case.

## II.  Factual Allegations

Willis alleges that the MDOC violated his rights under the ADA and RA.   (*See* ECF No. 47 (second amended complaint), PageID.527-532 (Count VI, which alleges an ADA claim), and PageID.532-534 (Count VII, which alleges a claim under the RA).)

4

Willis does not allege ADA or RA claims against any other Defendant. The remainder of his claims – Counts I to V – involve alleged violations of Willis's rights under the Eighth Amendment by the other 18 Defendants. (ECF No. 47, PageID.497-527.)

Willis set forth the substance of his claims in a "preliminary statement", pages 2-5 of the second amended complaint; a section of general factual allegations, pages 13-39; and then additional factual allegations in the seven separate Counts, pages 39-78.

In the "preliminary statement" portion of his amended complaint (*id.*, PageID.460-63), Willis alleges that on November 25, 2021, he was struck in the head by another inmate. (*Id.*, PageID.461.) This resulted in a five-millimeter subdural hematoma, episodes of dizziness, and loss of balance. (*Id.*) Willis alleges that despite his requests for medical care, he was left untreated. (*Id.*) Willis says that, due to lack of care, he had episodes of fainting that caused the hematoma to increase in size. (*Id.*) Willis says that he required emergency surgery on January 16, 2022. (*Id.*)

Willis says that after his surgery, Defendants continued to ignore his serious medical condition and deprived him of care and treatment. Willis says that Defendants failed to comply with his bottom bunk restriction after it was ordered by the treating physician at Alger Correctional Facility. (*Id.*) Willis says that on January 23, 2022, while he was on the top bunk, he fainted and fell to the floor striking his head. (*Id.*, PageID.462.) The injury required emergency brain surgery.

(*Id.*)   Willis says that the surgery resulted in his disability, and he now needs to use a wheelchair or walker.   (*Id.*)

Willis asserts that the MDOC violated his rights under the ADA when he was placed in an observation cell in the Marquette Branch Prison for five months after his surgery.   (*Id.*)   Willis says that during this period, he was deprived of programming, services, and other privileges due to his disability.   (*Id.*)   Willis says that Defendants placed him in isolation for 24 hours per day, deprived him of health care, verbally and physically abused him, and denied him access to showers and sanitary living conditions.   (*Id.*, PageID.462-463.)

The "factual allegations" portion of Willis's complaint, which begins on page 12 (*id.*, PageID.471) contains more details.   Willis alleges that after he was knocked unconscious on November 25, 2021, he was immediately taken to the hospital, where he received an MRI (Magnetic Resonance Imaging) scan of his head.   (*Id.*)   He returned to the LMF upon completion of the MRI.   Willis alleges that Defendant Wellpath contracted with the MDOC to provide medical treatment to inmates at LMF during the relevant time.   (*Id.*, PageID.472.)   Willis alleges that Defendant Westcomb worked as a physician for Wellpath at LMF.   (*Id.*)   Willis alleges that Defendants Wellpath and Westcomb were deliberately indifferent to his injury by failing to order follow-up care.   (*Id.*)

After Willis was released from segregation, he was assigned a top bunk in a protective custody unit.   (*Id.*)   Willis says he sent "kites" (written requests) on December 15 and 21, 2021 to health care due to experiencing light-headedness and

loss of balance.    (*Id.*)    Willis was informed that he was placed on a list for a call-out to be seen by a nurse.    (*Id.*, PageID.473.)

On December 28, 2021, Willis visited a kidney specialist for an ultrasound and computerized tomography (CT) scan of his brain.    (*Id.*)    On January 1, 2022, Willis submitted a medical kite for a bottom bunk detail because he was continuing to experience dizziness and loss of balance.    (*Id.*)    On January 4, 2022, Defendant Westcomb informed Willis that his CT scan showed a 5mm subdural hematoma on the left side of his brain.    (*Id.*, PageID.473-474.)    Westcomb informed Willis that she would schedule a follow-up CT scan with a neurosurgeon.    (*Id.*, PageID.474.) Westcomb issued Willis a Medical Special Accommodations Notice for a bottom bunk. (*Id.*)    Willis says that Westcomb violated prison policy by not providing him with a copy of the special accommodation notice.    (*Id.*, PageID.475.)    Willis asserts that he was not given a bottom bunk.    (*Id.*, PageID.476.)

Willis says that Defendant LMF ADW Contreras received the Special Accommodation Notice for a bottom bunk, but acted with deliberate indifference to Plaintiff's medical needs by not assigning him to a bottom bunk.    (*Id.*)    Willis says his condition worsened over the next ten days.    (*Id.*)    Willis sent a kite to health care complaining that his vision was blurry, that he was confused, and that he could feel pressure in his brain.    (*Id.*)    Although RN Koski saw Willis on January 14, 2022, Plaintiff complains that she acted with deliberate indifference to his kite because she only told him to practice relaxation techniques and to request medical care if his condition worsened.    (*Id.*)

7

Willis alleges that he alerted "prison staff" between January 1, 2022, and January 16, 2022, of his falls and lightheadedness, but "prison officials" never provided medical treatment despite "staff" witnessing him fall at least three times. (*Id.*, PageID.477.)

Willis says that on January 16, 2022, he awoke in pain and with difficulty seeing.   He was taken to Munising Memorial Hospital, where he received a CT scan that revealed he needed emergency surgery.   (*Id.*, PageID.477-478.)   Willis was taken to the Marquette General Hospital for brain surgery and stayed there for three days before returning to LMF.   (*Id.*, PageID.478.)

Willis spent his first night at LMF in an observation cell.   The next day, January 21, 2022, Willis returned to the general population where he was assigned a top bunk.   (*Id.*)   Willis says that Westcomb provided him with a copy of the special accommodation for a bottom bunk dated January 4, 2022.   (*Id.*, PageID.478-479.) Willis says that this was first time he received a copy of the special accommodation. (*Id.*)

Willis says that when he informed Defendant CO Cobb that he was supposed to have a bottom bunk, CO Cobb ignored him.   (*Id.*, PageID.479.)   Later, when CO Cobb was making rounds, Willis says that he showed CO Cobb his special accommodation for a bottom bunk, but again CO Cobb ignored him.   (*Id.*)   Willis argues that CO Cobb was deliberately indifferent to his medical need for a bottom bunk.   (*Id.*)

Willis then asserts that he told CO Brennan on January 22, 2022, that he had accommodation for a bottom bunk, but CO Brennan did nothing.   (*Id.*, PageID.480.) Willis argues that this shows that CO Brennan acted with deliberate indifference. (*Id.*)

Willis says that at lunch time on January 22, he experienced dizziness and lost his balance.   (*Id.*)   COs were able to catch him before he fell and then helped him sit down and brought him food.   (*Id.*)

Willis says that the next day, January 23, 2022, he lost consciousness while in his top bunk assignment and fell to the floor striking his head.   (*Id.*)   Willis was taken to Marquette General Hospital where a CT scan revealed bleeding on the right side of his brain that required immediate surgery.   (*Id.*, PageID.481.)

After surgery, Willis lost mobility in both legs, the ability to stand without assistance, and the ability to control his bowels.   (*Id.*)   Willis says he required physical therapy and rehabilitation due to the neurological injury he sustained from his fall off the top bunk.   (*Id.*)

Willis was released from the hospital and transferred to Marquette Branch Prison (MBP) on January 25, 2022.   (*Id.*, PageID.482.)   Willis says he was placed temporarily in an observation cell because the infirmary was full.   (*Id.*)   Willis says that he required the use of a wheelchair, but his observation cell was not designed for a wheelchair.   (*Id.*)

Willis says that during the five months that he remained in isolation in the observation cell, he was allowed to shower approximately 12 times and was deprived

of all in-person visits.   (*Id.*, PageID.483.)   Willis complains that he could not access the commissary, use JPay, attend religious services, or go the yard, library, or law library while he was confined in the observation cell.   (*Id.*)   Willis complains that he was deprived of all programming and the ability to exercise and was frequently locked in his cell for 24 hours per day.   (*Id.*, PageID.484.)

Willis says that he kited MBP Nurse Supervisor James several times while he was in the observation cell to request a move and for "appropriate medical care." (*Id.*)   Willis says that James acted with deliberate indifference to the cruel conditions of his confinement and took no action to ensure that he received appropriate medical care.   (*Id.*)   Willis says that the MDOC denied him access to the programs and the privileges that were afforded to other prisoners.   (*Id.*, PageID.485.)

Willis says that he was subjected to frequent verbal and physical abuse by MDOC staff.   (*Id.*, PageID.486.)   Willis alleges that when he was allowed to go to the shower on February 11, 2022, he noticed feces and fungus on the shower floor. (*Id.*)   Willis says that when he asked for assistance to avoid stepping on the feces and fungus, but NA Jones refused to help him.   (*Id.*)   Willis also alleges that Defendant CO Cavin pulled back the shower curtain, grabbed Plaintiff by the neck, and slammed him to the ground.   (*Id.*)   CO Cavin allegedly told Willis to stand up and return to his cell, but Plaintiff says that CO Cavin knew he was unable to physically comply with the order.   (*Id.*, PageID.487.)   Willis says that Cavin handcuffed him and dragged him on his stomach out of the shower area.   (*Id.*)

Willis received a misconduct ticket for disobeying a direct order and was found guilty after a hearing.   (*Id.*)

Willis alleges that Defendant CO Ogle called him names based upon his race and disability such as "crippled ni**er."   (*Id.*, PageID.47.)

Willis says that NA Jones told Willis that he deserved his situation and the prison needed to start treating prisoners as if it was the 1800s.  (*Id.*)  Willis also says that Neubecker and Jones between January and July of 2022, would regularly tell him that he smelled while refusing to give him a shower or materials to clean his cell.  (*Id.*)

Willis alleges that he needed assistance to get from his bed to the cell toilet, but Defendants James, Jones, Neubecker, Ogle, and Cavin ignored his requests for assistance and forced him to lie in his own feces for hours.  (*Id.*, PageID.489.)  Willis alleges that Defendant Wright denied his request for assistance and basic cleaning supplies, causing him to lie in his own feces for hours at time with no access to the showers.  (*Id.*)  Willis says that he was left in an observation cell for over five months due to his disability.  (*Id.*)

Willis says that on March 3, 2022, ADW Contreras interviewed him about his fall from his top bunk.  (*Id.*, PageID.490.)  RUM Erickson allegedly told Willis that if he gave up his walker, he would be moved out of the observation cell.  (*Id.*)  Willis says that RUM Viitala, ADW Pelky and Health Unit Manager (HUM) Scott acted with deliberate indifference to Plaintiff's medical needs by refusing to place him in an appropriate cell that could accommodate his disability.  (*Id.*, PageID.491-493.)

Willis further alleges that HUM Scott refused to arrange the rehabilitation care that was recommended after his brain surgery.   (*Id.*, PageID.493.)

Willis alleges that Warden Huss responded to his grievances, was aware of his circumstances and is responsible for the overall operation of the institution.   (*Id.*, PageID.494.)   Willis says that Warden Huss failed to move him out of the observation cell, provide him with privileges, or transfer him to an appropriate facility that could accommodate his disability.   (*Id.*, PageID.495.)   Willis says that Marquette General Hospital recommended placement in a rehabilitation facility for gait and balance training, physical therapy, occupational therapy, and speech therapy.   (*Id.*)   Willis asserts that these recommendations were ignored by the MDOC and Wellpath.   (*Id.*, PageID.496.)

Willis alleges that Dr. Chang was his assigned physician and that Chang saw him approximately 10 times while he was confined in the observation cell.   (*Id.*)   Willis says that Dr. Chang failed to order physical and occupational therapy as recommended by Marquette General Hospital and failed to provide appropriate after care.   (*Id.*)

Willis alleges that on July 1, 2022, he was released from the observation cell and transferred to the Chippewa Correctional Facility.   (*Id.*, PageID.497.)

### III.    Summary of Counts

In Count I (i*d.*, PageID.497-501), Willis alleges that Defendants Contreras, Brennan, Koski, and Cobb, who were employed at LMF, violated his rights under the Eighth Amendment by being deliberately indifferent to his serious medical needs.

12

In Count II (*id.*, PageID.501-509), Willis shifted to events at MBP, alleging that Defendants Huss, Pelky, Scott, Erickson, Vittala, Ogle, James, Jones and Neubecker violated his rights under the Eighth Amendment by being deliberately indifferent to his serious medical needs.   In Count III (*id.*, PageID.510-512), Willis alleges that CO Cavin used excessive force against him by slamming him to the ground in the shower, thus violating his Eighth Amendment rights.   In Count IV (*id.*, PageID.512-520), Willis alleges that Wellpath – by its customs, policies and/or practices – encouraged, permitted, caused and allowed Defendants Westcomb and Chang to be deliberately indifferent to his serious medical needs.   In Count V (*id.*, PageID.520-527), Willis asserts that Defendants Westcomb and Chang were deliberately indifferent to his serious medical needs.   And, as noted above, Counts VI and VII are the ADA and RA claims against the MDOC.

## IV.   Analysis

### A. Motions to Dismiss

Defendants filed three motions to dismiss.   The Federal Rules provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).   To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).   Put differently, if plaintiffs do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a claim has facial plausibility, a court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Those factual allegations "must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (internal citations omitted). "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

## 1.  **Defendant NA Jones**

Defendant NA Jones moves to dismiss the second amended complaint against her, arguing that Willis failed to state a cause of action.  As explained above, the only remaining claim against Defendant NA Jones is for failure to assist Willis, causing him to lie in his own feces for hours.

In ordering a second amended complaint, it was not the intention of the Court to allow Willis to revive dismissed claims.  As stated above, Count II of the second amended complaint is essentially identical to the first amended complaint but with

more factual allegations, not less.  Willis alleges that Defendant Jones failed to assist Willis and caused Willis to lie in his own feces for hours during the first two months that Willis was housed at MBP, as set forth in paragraphs 131, 132, and 194 of the second amended complaint.   (ECF No. 47, PageID.488, 506 (second amended complaint).)

For the very same reasons set forth in the R&R dated April 21, 2023, at ECF No. 42, PageID.401-407, the undersigned recommends that the Court deny the motion to dismiss as to James.   In addition, to the extent that Defendant NA Jones moves to dismiss the claims against her that have been previously dismissed, it is recommended that the Court deny that request as moot.

### 2.  Defendant Wellpath

Defendant Wellpath filed two motions to dismiss.   The first motion filed by Wellpath was to dismiss the first amended complaint.   (ECF No. 44.)    That motion is now moot because Willis has filed a second amended complaint.   The second motion filed by Wellpath is to dismiss the second amended complaint.   (ECF No. 51.)

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to Section 1983 actions for alleged constitutional violations, albeit in a narrow set of circumstances. "A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, '*solely* because it employs a tortfeasor.'"   *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).   Instead, a municipality may only be liable under § 1983 when its policy

15

or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).

In a municipal liability claim, the finding of a policy or custom is the initial determination to be made.   *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Doe*, 103 F.3d at 508–509.

"The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983."   *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).   Similarly, the delivery of health care by a private provider to state prisoners pursuant to a contract with the state constitutes actions under color of state law for purposes of Section 1983.   *West v. Atkins*, 487 U.S. 42, 57 (1988).   As a result, a *Monell* claim would be equally applicable against Wellpath.   And this Court has applied *Monell* liability to prison contract health care providers.   *See, e.g., Nobles v. Quality Correctional Care of Michigan, et al.*, No. 1:21-CV-199, 2021 WL 1827077, at *5 (W.D. Mich. May 7, 2021) (stating that "Corizon, like a governmental entity, may be held liable under § 1983 if it actually caused the constitutional deprivation").

To state and prove a deliberate indifference claim against Wellpath, Willis must allege and show that "through its deliberate conduct, [Wellpath] was the 'moving force' behind the injury alleged." *Allman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). He must state that Wellpath had a "policy or custom" that caused a violation of his rights. *Monell*, 436 U.S. at 694.

A successful *Monell* claim can rest on one of four different theories of liability: (1) a clear and persistent pattern of unconstitutional conduct by contractor's employees, (2) the municipality's notice or constructive notice of the unconstitutional conduct, (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction, and (4) that the policy of inaction was the moving force of the constitutional deprivation.   *Winkler*, 893 F.3d at 902.

Willis asserts that in his second amended complaint he set forth six of Wellpath's "widespread practices, customs and/or policies" that caused his injuries. (ECF No. 47, PageID.517-518 (second amended complaint Count IV ¶223(f)(i-vi). Willis alleged that Defendant Wellpath:

1.  failed to properly and adequately monitor Plaintiff's medical condition in utter and/or deliberate indifference of said risks; or

2.  failed to properly and adequately alleviate, treat and/or control Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks, or

3.  improperly and inadequately treated and/or attended to Plaintiff's medical condition and symptoms in utter and/or deliberate indifference of said risks, or

4.  failed to properly and adequately and or timely diagnose Plaintiff's chronic subdural hematoma due to his dizziness and sudden fails in utter and/or deliberate indifference of said risks, or

5.  refused to provide physical and occupational therapy along with gait and balance training in spite of continued and/or unresolved symptoms and/or signs of unsteady, abnormal gait in utter and/or deliberate indifference of said risks, and

6.  failed to ensure that Plaintiff was placed on a bottom bunk after learning of Plaintiff's subdural hematoma, despite Plaintiff being placed on a bottom bunk restriction by Defendant Westcomb on or about January 4, 2022.

*Id.*

Willis incorrectly argues in his brief that Wellpath only focuses on the lack of a stated policy in his second amended complaint that caused his alleged constitutional harm.  (ECF No. 55, PageID.703.)  Rather, Willis argues that the above statements in the complaint are "six specific customs of Defendant Wellpath" that caused his constitutional injury.  (*Id.*)

Willis's alleged "six customs" is nothing more than simply a list of six conclusions of what he says one or more of the named individual Defendants failed to do.  But Willis did not allege a single Wellpath custom, policy, or procedure that

possibly could have violated his constitutional rights.   Willis actually concedes this point by asserting that "without the benefit of discovery at this stage of the litigation, [he] is not yet privy to the enumerated and detailed polices of Defendant Wellpath." (ECF No. 55, PageID.703.)   Although not conceded, Willis is also not "privy" to any custom of Wellpath that arguably violated his rights.   And despite Willis's assertion that he set forth Wellpath customs in his second amended complaint, he did nothing more than state conclusions with only the hope of finding support.   That is not enough to state a claim upon which relief may be granted.   Moreover, each of alleged enumerated "customs" is at best an alleged custom of inaction of one or more of the Defendants.   When a plaintiff asserts a custom of inaction he must show (1) a clear and persistent pattern of misconduct, (2) notice or constructive notice of defendant, (3) defendants' tacit approval of the misconduct, and (4) a direct causal link to the alleged violations.   *Nouri v. County of Oakland*, 615 Fed. App'x 291, 296 (6th Cir. 2005).

Therefore, even if Willis ultimately supports his allegations, Willis cannot establish that solely based upon his own experiences, Wellpath had a custom of (1) refusing to provide inmates with constitutionally adequate medical treatment, or (2) refusing to provide inmates physical therapy, or (3) refusing to provide inmates a medically necessary bottom bunk detail.   Willis has failed to set forth any factual allegations that could arguably allege a pervasive pattern of misconduct by Wellpath in the treatment of inmates.   *Id.*   In the opinion of the undersigned, Willis's failure

to adequately set forth either a policy, custom, or procedure of Wellpath that could have violated his constitutional rights, requires Wellpath's dismissal from this action.

### B. Motion for Summary Judgment

Defendants Huss, Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright filed a motion for summary judgment arguing that Willis failed to exhaust his administrative remedies against them.    Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[1] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and

---

[1]    If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).    Instead, the court may conduct a bench trial to resolve the issue.    (*Id.*)    In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence.    *Id.* at 677 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)) ("Failure to exhaust administrative remedies is an affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 1.    Defendants Huss, Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.   *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).   "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."   *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).   Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."   *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.   *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).   A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative

process.    *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.    *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).    "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"    *Jones*, 549 U.S. at 218-19.    In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."    *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.    In the Court's view, this objective was achieved in three ways.    First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."    *Id.* at 525.    Second, "the internal review might 'filter out some frivolous claims.'"    *Id.* (quoting *Booth*, 532 U.S. at 737*).*    And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id*. When institutions provide adequate notice as required under the PLRA, the opportunity to address the claims internally

furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

The most common procedure through which a prisoner in MDOC custody exhausts his administrative remedies is the grievance procedure set forth in Michigan Department of Corrections (MDOC) Policy Directive 03.02.130 (effective on March 18, 2019). According to the Policy Directive inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ Q. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ Q, W. The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ Y. The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after

the response was due.  *Id.* at ¶ DD.  The respondent at Step II is designated by the policy.  *Id.* at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.*  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ II.

Where the grievance procedures are not available because the issue presented is non-grievable, exhaustion of prison grievance procedures is not required.  It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well known proverb states, they cannot have their cake and eat it too.").

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010). The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process."). An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits. *See id.* at 325. We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court." *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[2]

Defendants identified five grievances that Willis filed with MDOC. Those grievances are summarized below. The first four grievances listed below are relevant to Defendants' motion for summary judgment.

---

[2]    In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints." *Id.* at 596. For example, grieving a doctor about his failure to give cardiac catheterization did not grieve the claim that the doctor erred by not prescribing Ranexa.

| Grievance No. | Person Named | Allegation | Date or Date Range of Incident(s) | Results at Step 1 | Results at Step 2 | Results at Step 3 |
|---|---|---|---|---|---|---|
| MBP-22-04-0607-03f (ECF No. 54-3, PageID.660-663.) | James | Unfair and inhumane treatment due to being housed in an observation cell and not in an infirmary cell | 3-21-22 | denied | denied | denied |
| MBP-22-05-0744-21b (*Id.*, PageID.664-667.) | RUM Erickson | Inhumane treatment, cruel and unusual punishment, and race discrimination because Erickson told him he could not leave the suicide cell until he no longer needed a walker, although he is not suicidal and was cleared by Health Services. | 5-2-22 | denied | denied | denied |
| LMF-22-03-0214-03f (*Id.*, PageID.669-671.) | PA Westcomb, CO Brandon (Brennan), and CO Cobbs | Received a bottom bunk detail on 1-4-22, instead assigned a top bunk which he fell from on 1-23-22 and sustained injuries. | 1-23-22 | denied | denied | denied |
| MBP-22-03-0459-25f (*Id.*, PageID.672-675.) | none | Refusal to allow prison visits violates prison policy | 3-1-22 | resolved | resolved | denied |
| MBP-22-02-0349-26a (*Id.*, PageID.677-681.) | NA Jones and CO Cavin | Entered infirmary shower and noticed | 2-11-22 | denied | denied | denied |

| Grievance No. | Person Named | Allegation | Date or Date Range of Incident(s) | Results at Step 1 | Results at Step 2 | Results at Step 3 |
|---|---|---|---|---|---|---|
| | | fungus and toenail clippings on floor, and feces on shower stool. Jones refused to clean or exchange dirty material and Cavin assaulted him. | | | | |

Although Willis acknowledges that he did not specifically name each Defendant in a properly exhausted Step I grievance, he argues that he did not need to name each Defendant in his grievances.    That is only true if Willis failed to name anyone in his grievance *and* the MDOC waived its own procedural requirements by addressing the merits of the grievance through each step of the process.    Willis cites the decisions in *Reed-Bey* and *Morgan v. Treirweiler*, 67 F.4th 362 (6th Cir. 2023), as authority to support his argument that he did not have to name each Defendant in a grievance to exhaust his administrative claims against them.    (ECF No. 59, PageID.412; ECF No. 74, PageID.479.)    As explained above, the Sixth Circuit recognized in *Reed-Bey* that the MDOC grievance procedures require a prisoner to specifically name the person being grieved to allow the MDOC to address the grievance with the appropriate official.    An MDOC inmate fails to properly exhaust his grievance against officials who are not named in a grievance, except for instances

where the MDOC waives that requirement.   Willis's argument has been rejected by

the Sixth Circuit.   The Sixth Circuit explained:

> [Plaintiff's] argument that this grievance was being decided on the
> merits is significant because in *Reed-Bey v. Pramstaller*, 603 F.3d 322,
> 325 (6th Cir. 2010), we held that "[w]hen prison officials decline to
> enforce their own procedural requirements," such as the requirement to
> identify the names of those involved in the issue being grieved, and
> instead "opt to consider otherwise-defaulted claims on the merits, so as
> a general rule will we." However, *Reed-Bey* does not stretch to meet the
> facts of this case.
>
> In *Reed-Bey*, the inmate failed to name a single individual in his
> grievance, and it would have thus been clear to prison officials when
> they addressed the merits of the grievance that they were waiving their
> own procedural requirement to include the names of those involved in
> the grievance. *See id.* at 324. But here, [Plaintiff] listed two people at
> step I of the grievance, Bierstetel and Havelka. Accordingly, prison
> officials would naturally assume that [Plaintiff] complied with the
> requirement to name those involved, and defendants cannot be said to
> have waived the exhaustion defense when they had no way of knowing
> that they would be the subject of a later lawsuit. *See Luther v. White*,
> No. 5:17-CV-138-TBR, 2019 WL 511795, at *8 (W.D. Ky. Feb. 8, 2019)
> (declining to apply *Reed-Bey* where inmate named a specific individual
> in grievance but not later defendants to the lawsuit).

*Brown v. McCullick*, No. 18-2226, 2019 WL 5436159, at *3 (6th Cir. Apr. 23, 2019).

A different circumstance occurred in *Morgan*.   Morgan submitted a grievance

that did not name any specific individual but named the "IBC" staff.   *Morgan v.*

*Trierweiler*, 2022 WL 4244391 (W.D. Mich., April 15, 2022), *reversed in part Morgan*,

67 F.4th 362.   There, the MDOC denied the grievance on the merits at each step of

the process without enforcing the MDOC's procedural requirement that a prisoner

was required to name the individual grieved.   The Sixth Circuit agreed that the

grievance was exhausted and quoted the R&R stating that "Morgan could sue any

IBC official on the claims he exhausted in this grievance."   *Morgan*, 67 F.4th at 371.

28

It is important to note that Morgan failed to name any specific individual in his grievance.   If Morgan had identified one staff member as the individual being grieved, the Court would have concluded that he only exhausted his claims against that one identified staff member.   Morgan and Willis's grievances are not similar. Morgan did identify the entire prison staff in his grievance and the MDOC still did not reject his grievance as procedurally improper.

The Court turns to a discussion of the four relevant grievances.

### a.  MBP-22-04-0607-03f

The parties agree that grievance MBP-22-04-0607-03f (ECF No. 54-3, PageID.660-663) named Nurse Supervisor Brenda James.   (ECF No. 54, PageID.640 and ECF No. 57, PageID.728.)   Willis further states that he named in his Step III grievance Defendants Erickson, Scott, and Huss "as people who he had talked about moving him to an appropriate cell".   (ECF No. 57, PageID.729.)

Willis's Step I grievance stated:

| Name (print first, last) | Number | Institution | Lock Number | Date of Incident | Today's Date |
|---|---|---|---|---|---|
| Amon Willis | 897402 | MBP | WVD | 3-21-22 | 3-28-2022 |

**What attempt did you make to resolve this issue prior to writing this grievance? On what date?** 3-24-2022

If none, explain why. I wrote/kited MS. James, asking to be housed in an appropriate cell (Infirmary cell) so that I may be treated Humanely and provided reasonable accommodations.

State problem clearly. Use separate grievance form for each issue. Additional pages, using plain paper, may be used. Four copies of each page and supporting documents must be submitted with this form. The grievance must be submitted to the Grievance Coordinator in accordance with the time limits of OP 03.02.130.  DUE to having two Brain Surgeries on 1/16/2022 and 1/23/2022, I have been transferred from Alger correctional Facility to Marquette Branch Prison for medical needs on 1/25/2022. I am to be housed in a Infirmary cell, on the contrary I am being housed in a Segegated observation cell level V. I am being punished for reasons beyond my control. Prisoners shall be treated humanely and with dignity in matters of Health care, personal safety and general living conditions. This is also contrary to the goals of encouraging self-reliance and rehabilitation, as well as unfair, PER PD 03.03.130 Humane Treatment and Living conditions for prisoners. I have Not been provided with reasonable accommodations so that I may participate in Programs, services and activities in this matter PER PD 03.04.100 and 04.06.160 Prisoners with Disabilities.

Amon Willis
Grievant's Signature

(ECF No. 54-3, PageID.663.)

The MDOC Step I grievance form has two main sections. The first section covers the attempts the prisoner made to resolve the issue before writing the grievance. In the above grievance, Willis says that he wrote to Ms. James and asked to be housed in an infirmary cell. The second section states the grievance issue. Willis did not name any individual in this section that identified the target of the grievance. Both Willis and the moving Defendants agree that the Step I grievance was against James.[3] The Step I response indicates that James denies that she

---

[3]    Specifically, Willis states in his response brief, "[i]n his Step I grievance, the only Defendant mentioned by name is Defendant JAMES, however, the grievance provides sufficient detail to put prison staff on notice that Plaintiff was complaining that he was improperly housed and that he was being denied services on account of his disability."  (ECF No. 57, PageID.728.)

received anything from Willis regarding being transferred to the infirmary.    Willis also argues that at Step III he added the names RUM Erickson, HUM Scott, and Warden Huss.   (ECF No. 54-3, PageID.661.)   First, as explained above, because the parties agree that Willis named James in the Step I grievance and the grievance response addressed the grievance as against James, Willis exhausted this grievance against James.    The response stated:



(ECF No. 54-3, PageID.663.)

Second, contrary to Willis's argument, for the reasons explained above, he cannot sue everyone who worked at the prison based upon this grievance because, as the parties concede, he named James in his Step I grievance.

Third, by adding the names RUM Erickson, HUM Scott, and Warden Huss to the Step III grievance for the first time, Willis did not exhaust his grievance remedies against them.    The MDOC Policy Directive on the grievance process – P.D. 03.02.130(C) – provides that "[c]omplaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance *through all three steps of the grievance process* in compliance with this policy."   (ECF No.54-2, PageID.646 (emphasis added).)

31

Accordingly, when grievable issues arise, a prisoner must file a Step I grievance; the prisoner does not exhaust his claims by asserting new allegations of wrongdoing in an appeal to a pre-existing grievance.  *See Burton v. Jones*, 321 F.3d 569, 574 ("We understand these policies to require that a prisoner seeking to administratively exhaust a claim against a prison official describe the alleged mistreatment or misconduct at Step I of the grievance process.   By negative implication, we understand these policies to preclude administrative exhaustion of a claim against a prison official if the first allegation of mistreatment or misconduct on the part of that official is made at Step II or Step III of the grievance process."), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199 (2007).   It is also important to note that Steps II and III of the grievance process function as appeals of the response rendered to a Step I grievance, rather than additional grievances.

Therefore, Willis did not exhaust his grievance remedies against Erickson, Scott, and Huss by including their names for the first time in his Step III grievance appeal.   In the opinion of the undersigned, grievance MBP-22-04-0607-03f exhausted only Willis's claim against Defendant James asserting that he was denied a cell in the infirmary and instead housed in observation, which resulted in inhumane living conditions and loss of privileges.   This grievance arguably exhausts the claims Willis made against Defendant James in Count II of his second amended complaint at ¶¶ 193, 197-202.

### b.  MBP-22-05-0744-21b

In MBP-22-05-0744-21b (ECF No. 54-3, PageID.664-667), Willis asserted that when he asked RUM Erickson if he could be transferred out of the "suicidal mental observation" unit, RUM Erickson told him he would not leave until he was able to walk without his walker.    The Step I grievance says:



(ECF No. 54-3, PageID.666.)    First, Defendant Erickson concedes that this grievance exhausts the claims asserted by Willis against him in Count II of the second amended complaint.    But Willis says that he exhausted his claims against Scott, Pelky, and Huss by naming them in his Step III appeal.    For the reasons explained above, naming an individual for the first time in a Step III appeal does not exhaust a claim against them.    *Burton*, 321 F.3d at 574.

33

Willis also asserts that since Viitala, Pelky, and Huss reviewed the grievances, he exhausted claims against each of these Defendants.   Warden Huss was the Step II respondent and the individual who denied Willis's Step II appeal.   (ECF No. 54-3, PageID.665.)   RUM Viitala was the Step I respondent who denied Willis's Step I grievance, and ADW Pelky reviewed the Step I grievance with Willis.   (*Id.*, PageID.666-667.)   Nothing within Willis's Step I grievance or Step II appeal indicated that Viitala, Pelky, or Huss were the persons being grieved.   (ECF No. 54-3, PageID.665-666.)   They were involved in processing the grievance after Willis submitted it.   Under MDOC Policy Directive 03.02.130(V) "staff who may be involved in the issue being grieved shall not participate in any capacity in the grievance investigation, review, or response, except as necessary to provide information to the respondent."   Further, the policy provides that "[t]he respondent shall generally be the supervisor of the person being grieved."   MDOC Policy Directive 03.02.130(Y).   Since Viitala, Pelky, and Huss were the individuals who either reviewed or responded to Willis's grievance, they were not the individuals that Willis intended to grieve.   *Vartinelli v. Cady*, 2009 WL 706083, *3 (E.D. Mich., March 13, 2009) ("Plaintiff's obligation to exhaust his claims against these Defendants is not satisfied by the fact that they have responded to a grievance.")   To exhaust his claims against Viitala, Pelky, and Huss, Willis needed to name them in his grievance at Step I.   Willis did not do that, and he cannot now claim that he

exhausted his grievance remedies against them because they were involved in responding to his grievance or appeals.[4]

In the opinion of the undersigned, grievance MBP-22-05-0744-21b exhausted only Willis's claims asserted in count II of his second amended complaint against RUM Erickson.

### c. LMF-22-03-0214-03f

In LMF-22-03-0214-03f (*id.*, PageID.669-671), Willis grieved COs "Brandon" (Brennan) and Cobb, and arguably PA Westcomb.   The Step I grievance states:

---

[4]     Notably, the Sixth Circuit has held that where the defendant's only involvement in the allegedly unconstitutional conduct is "the denial of administrative grievances or the failure to act," the defendant cannot be liable under § 1983.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).   The reason is that there must be active unconstitutional behavior.   Failing to intervene on a prisoner's behalf to remedy alleged unconstitutional behavior does not amount to active unconstitutional behavior by a person who merely denies an administrative grievance.   *Id.*   Also, the Sixth Circuit has held that a prisoner's allegation that a defendant improperly denied a grievance is not a claim of constitutional dimension because there is "no inherent constitutional right to an effective prison grievance procedure."   *Overholt v. Unibase Data Entry, Inc.*, No. 98-3302, 2000 WL 799760, at *3 (6th Cir. June 14, 2000).



(ECF No. 54-3, PageID.671.)

Willis makes two arguments. First, Willis asserts that he included enough detail in his grievance to place all prison staff responsible for his bunk assignments on notice – not simply Cobbs, Brennan, and Westcomb. Willis named three specific individuals in his grievance. For the reasons explained above, this grievance can only exhaust available grievance remedies against the individuals named in the grievance. *Brown v. McCullick*, No. 18-2226, 2019 WL 5436159, at *3.

Willis's second argument is that he had no available grievance remedy at the time he filed this grievance because he had already injured himself by failing off the top bunk, he already had been moved to MBP and provided a bottom bunk, and he could not obtain monetary damages through the grievance process.   The Supreme Court stated that a grievance is available where it is "capable of use" to obtain "some relief for the action complained of."   *Ross*, 578 U.S. at 642 (*citing Booth*, 532 U.S. at 738).[5]   Like litigation, grievances often seek to address concerns after an inmate has faced some type of harm or adversity.   The grievance process is designed in part to give an institution notice and opportunity to resolve a prisoner's complaints internally prior to litigation.   *Porter*, 534 U.S. at 525.   A prisoner must exhaust administrative remedies even if the relief he desires is not available in the administrative process.   *Id.* at 520.   "[A] prisoner must now exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process."   *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).   Willis had an available administrative remedy and he used it by filing the above grievance. Relief other than monetary damages was available to Willis.   For example, additional protection or medical care could be provided and any offending employee could face sanctions or discipline if the investigation revealed improper conduct.

---

[5]    The Supreme Court set forth three examples of when a grievance remedy is unavailable:   (1) when it operates as simply dead end where officers are unable or consistently are unwilling to provide relief, (2) where the administrative scheme is so opaque that it becomes incapable of use, and (3) where prison administrators thwart an inmate from taking advantage of the grievance process.   *Ross*, 578 U.S. at 643-644.

In the opinion of the undersigned, LMF-22-03-0214-03f exhausted Willis's grievance remedies for claims involving the failure to provide him a bottom bunk as asserted in count I of his second amended complaint against Defendants Brennan and Cobb, and in count V against Defendant Westcomb.

### d.  MBP-22-03-0459-25f

In MBP-22-03-0459-25f (*id.*, PageID.672-675) Willis complained that he was not allowed visitation.   The Step I grievance stated:



(ECF No. 54-3, PageID.675.)   Willis did not name anyone in this grievance.   In the section asking what attempts he made to resolve the grievance, Willis stated he wrote the PC and RUM.   Defendants claim that at that time, the RUM was Erickson, and the PC was Viitala.   The grievance was not answered in a manner that would allow the Court to conclude that the MDOC believed the grievance was against Erickson and Viitala.   (*Id.*)   The Step I response stated:

38

RESPONSE (Grievant Interviewed?    ☐ Yes  ☒ No    If No, give explanation.  If resolved, explain resolution.)

Prisoner Willis has arrived to MBP on 1/25/22 for medical needs. He is currently placed in Q-block for follow up medical appointments. Willis is not on any visit restrictions and is off LOP on 3/11/22. He may schedule visits during normal visiting hours as approved. Grievance Resolved. No further clarification was need grievant not interviewed.

(*Id.*)

Willis's Step II appeal did not name any individuals and the Step II response did not address Erickson or Viitala.   The Step II response stated:

**STEP II – Response:**

A review of your Step II appeal has been completed. I have also reviewed your Step I grievance and the response. Your issues regarding your visits in Q-block have been appropriately addressed in the Step I response. During the time you were in Q-block visiting was allowed for approved visitors. You are no longer locking in Q-block and are now locking in WVD infirmary observation cell for medical reasons. Due to a current scabies outbreak in person visiting is not allowed until after the 18th and as advised by the medical team. However online visits can be scheduled threw GTL by your approved visiting peoples and scheduled by them online. Directions are on the Michigan corrections.gov website. No information has been presented that would support your claim that staff violated Department Policy. Any additional issues will not be addressed during the Step II appeal in accordance with PD-03.02.130 Prisoner Parolee Grievances. This grievance is considered resolved.

(*Id.*, PageID.674.)

As explained above, when a grievance that fails to name a specific individual is addressed by the MDOC and not procedurally rejected, that grievance exhausts claims against any prison official involved in the alleged deprivation.   But here, Willis specifically made an allegation regarding visitation against Defendants MBP Warden Huss and the MDOC in his second amended complaint.[6]   In the opinion of the undersigned, grievance MBP-22-03-0459-25f exhausted Willis's claims that he was denied visitation privileges as generally alleged in ¶¶97-98 and more specifically in ¶152 and ¶182 against Defendant MBP Warden Huss as set forth in count I of his

---

[6]     Since Willis is represented by counsel, he is not afforded the benefit of the less stringent standard of construction given to *pro se* prisoner's pleadings.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Haines v. Kerner*, 404 U.S. 519 (1972).

second amended complaint, and in ¶111 against Defendant MDOC as alleged in count VI of the second amended complaint.

## V.   Recommendation

It is respectfully recommended that the Court:

1. deny NA Jones's motion to dismiss claims that have been previously dismissed by the Court as moot, and deny the motion to dismiss the remaining claim against her for allegedly failing to assist Willis and causing him to lie in his own feces (Count II);

2. deny Wellpath's motion to dismiss the first amended complaint as moot, and grant Wellpath's motion to dismiss the second amended complaint against Wellpath (Count IV); and

3. grant in part and deny in part Defendants Huss, Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright's motion for partial summary judgment by granting the motion as to Defendants Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright due to Willis's failure to exhaust his administrative remedies.   And then grant the motion as to Defendant Huss in all respects except for Willis's claim that Huss denied him visitation privileges while he was housed in an observation cell.

If the Court adopts these recommendations, the following claims in the second amended complaint will remain in the case:

1. Count I against Defendants Brennan and Cobb;

2. Count II against Defendants Huss (limited to visitation), Jones (limited to causing Willis to lie in his own feces), Erickson, and James;

3. Count III against Defendant Cavin;

4. Count V against Defendant Westcomb and Chang; and

5. Counts VI and VII against Defendant MDOC.

In addition, if the Court adopts these recommendations, Count IV will be dismissed in its entirety, and Wellpath, Neubecker, Ogle, Contreras, Pelky, Scott, Vittala, Koski, and Wright will be dismissed from the case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    October 10, 2023                    /s/ *Maarten Vermaat*
                                             MAARTEN VERMAAT
                                             U.S. MAGISTRATE JUDGE